CASE NO. 25-1430

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

KRISTIN SIMMONS,

*Plaintiff – Appellant*,

v.

UM CAPITAL REGION HEALTH, INC.; DIMENSIONS HEALTH
CORPORATION d/b/a UM CAPITAL REGION HEALTH, INC.

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MARYLAND

## OPENING BRIEF OF APPELLANT
## KRISTIN SIMMONS

Joyce E. Smithey, Esq.
Reuben W. Wolfson, Esq.
Liesel J. Schopler, Esq.
Smithey Law Group LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com
liesel.schopler@smitheylaw.com

*Counsel for Plaintiff-Appellant Kristin Simmons*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

JURISDICTIONAL STATEMENT ............................................................................ 1

STATEMENT OF ISSUES ........................................................................................ 1

STATEMENT OF CASE ............................................................................................ 2

    I.     Introduction ........................................................................... 2

    II.    Statement Of Facts ................................................................ 5

          A.     Simmons's Background and Disability ......................... 5

          B.     Simmons was Treated Differently than her Non-Disabled Colleagues. .......................................................... 7

          C.     Simmons Sought to Prevent Defendants from Defrauding the Government. .......................................................... 11

          D.     Simmons's Termination was Not in Accord with her Performance Evaluations and Defendants' Progressive Discipline Policy. .......................................................... 16

               1.     Simmons had satisfactory performance reviews. ......... 16

               2.     Simmons never received any formal discipline prior to her termination. .......................................................... 18

          E.     Defendants' Purported Legitimate, Non-Discriminatory Reasons for Terminating Simmons Were Inconsistent over Time. ....... 20

          F.     Several of Defendants' Justifications for Terminating Simmons are *Post Hoc* Rationalizations and/or Contradicted by the Evidence. .......................................................... 21

i

SUMMARY OF ARGUMENT ............................................................................31

ARGUMENT ......................................................................................................33

  I.  Standard Of Review ……………………………...………………33

  II.  The District Court Erred By Dismissing And Weighing Evidence Contrary To The Mandates Of Rule 56. …………………………..34

  III.  The District Court Erred In Granting Summary Judgment On Count I Because There Are Triable Facts Capable Of Proving Capital Health's Reasons For Terminating Simmons Are Pretext. …………………37

  IV.  The District Court Erred In Granting Summary Judgment On Counts III And IV Because There Are Triable Facts Capable Of Proving Simmons Engaged In Protected Activity. …………………………...44

CONCLUSION ...................................................................................................33

STATEMENT REGARDING ORAL ARGUMENT ..........................................51

ii

**TABLE OF AUTHORITIES**

**Cases**                                                                                    **Page**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..................................................................... 49

*Ballinger v. N.C. Agric. Extension Serv.*,
    815 F.2d 1001 (4th Cir. 1987) ................................................... 43

*United State v. Beidler*,
    110 F.3d 1064 (4th Cir. 1997) ................................................... 49

*Cowgill v. First Data Techs., Inc.*,
    41 F.4th 370 (4th Cir. 2022) ..................................................... 38

*Dorriz v. District of Columbia*,
    133 F. Supp. 3d 186 (D.D.C. 2015)........................................... 38

*EEOC v. Mfrs. & Traders Tr. Co.*,
    402 F. Supp. 3d 201 (D. Md. 2019)........................................... 43

*EEOC v. McLeod Health, Inc.*,
    914 F.3d 876 (4th Cir. 2019) ..................................................... 42

*EEOC v. Sears Roebuck*,
    243 F.3d 846 (4th Cir. 2001) ............................................... 38, 40

*Feldman v. Law Enf't Assocs. Corp.*,
    752 F.3d 339 (4th Cir. 2014) ..................................................... 41

*Fordyce v. Prince George's Cnty.*,
    43 F. Supp. 3d 537 (D. Md. 2014)............................................. 38

*Graham v. Honeywell Int'l, Inc.*, No. 21-0310,
    2022 U.S. Dist. LEXIS 159639 (D. Md. Sept. 2, 2022)......... 44, 45

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    545 U.S. 409 (2005).................................................................. 45

iii

*Guessous v. Fairview Prop. Invs., LLC,*
    828 F.3d 208 (4th Cir. 2016) ................................................................ 41

*Hamilton v. 1st Source Bank,*
    895 F.2d 159 (4th Cir. 1990) ................................................................ 39

*Hearn v. Edgy Bees Inc.*, No. 21-2259,
    2023 U.S. Dist. LEXIS 72677 (D. Md. Apr. 25, 2023)........................ 45

*Jacobs v. N.C. Admin. Office of the Courts,*
    780 F.3d 562 (4th Cir. 2015) ................................................ 32, 37, 38, 42

*Kritter v. Mooring*, No. 24-1158,
    2025 U.S. App. LEXIS 12066 (4th Cir. May 19, 2025) ........................ 33

*Nichols v. Ashland Hosp. Corp.,*
    251 F.3d 496 (4th Cir. 2001) ................................................................ 41

*Ray v. Roane,*
    93 F.4th 651 (4th Cir. 2024) ................................................................ 36

*Smith v. CSRA,*
    12 F.4th 396 (4th Cir. 2021) ................................................................ 40

*Stiles v. General Elec. Co.*, No. 92-1886,
    1993 U.S. App. LEXIS 2870 (4th Cir. Feb. 12, 1993)........................ 39

*Tolan v. Cotton,*
    572 U.S. 650 (2014).............................................................................. 33

*United States ex rel. Grant v. United Airlines Inc.,*
    912 F.3d 190 (4th Cir. 2018) .........................................................44, 45, 46

*Wannamaker-Amos v. Purem Novi, Inc.,*
    126 F.4th 244 (4th Cir. 2025) .........................................................33, 37, 39, 40

*Weihua Huang v. Rector & Visitors of the Univ. of Va.,*
    896 F. Supp. 2d 524 (W.D. Va. 2012)................................................ 50

iv

**Federal Statutes**

28 U.S.C. § 1291 ............................................................................................ 1

28 U.S.C. 1331 ............................................................................................... 1

28 U.S.C. § 1367 ............................................................................................ 1

31 U.S.C. § 3729 *et seq.* ("FCA")............................... 1, 2, 5, 32, 36, 44, 45, 46, 50

31 U.S.C. § 3730(h) ................................................................................ 44, 45

31 U.S.C. § 3730(h)(1)................................................................................ 2, 44

42 U.S.C. § 12101 *et seq.* ("ADA").................................................1, 2, 3, 5, 35, 37

42 U.S.C. § 12112(a) .................................................................................... 37

**State Statutes**

Md. Code Ann., Health-Gen. § 2-601, *et seq.* ("MFCA")................................ 1,

Md. Code Ann., Health-Gen. § 2-607(a) ........................................................ 44

Md. Code Ann., Health-Gen. § 2-607(b) ......................................................... 2

**Rules**

Fed. R. Civ. P. 34(a)...................................................................................... 51

Fed. R. Civ. P. 56 .................................................................................... 34, 49

Fed. R. Civ. P. 56(a)................................................................................ 33, 34

U.S. Court of Appeals for the Fourth Circuit Local Rule 34(a) ....................... 51

**Other Authorities**

10B CHARLES ALAN WRIGHT & ARTHUR D. MILLER,
       FEDERAL PRACTICE & PROCEDURE § 2739 (4th ed. 2024) .................... 34

**JURISDICTIONAL STATEMENT**

District court jurisdiction over federal claims under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*. ("ADA"), and the False Claims Act, 31 U.S.C. § 3729 *et seq*. ("FCA"), was based on 28 U.S.C. 1331, with supplemental jurisdiction over the Maryland False Claims Act, Md. Code Ann., Health-Gen. § 2-601, *et seq.* ("MFCA"), based upon 28 U.S.C. § 1367. This Court has jurisdiction pursuant to 28 U.S.C. § 1291 as this appeal arises from a final judgment of the district court entered on February 13, 2025, disposing of all claims. Appellant Kristin Simmons ("Appellant" or "Simmons") filed timely notice of her instant appeal on March 17, 2025. JA643.

**STATEMENT OF ISSUES**

1.      Whether the district court erred by failing to consider all evidence in the record and by stating the facts in the light most favorable to Appellees UM Capital Region Health, Inc. and Dimensions Health Corporation, d/b/a UM Capital Region Health, Inc. (collectively, "Defendants" or "Capital Health")?

2.      Whether the district court erred in granting judgment as a matter of law with respect to Simmons's discrimination claim under the ADA (Count I) on the ground that there is not even an inference from the evidence giving rise to a genuine issue of material dispute as to whether the purported legitimate and nondiscriminatory reason Capital Health gave for firing her was pretextual?

1

3.      A claim for retaliatory discharge under the FCA and MFCA is shown where the plaintiff took "lawful acts . . . or other efforts to stop 1 or more violations of this subchapter" and that plaintiff's employer "discharged" her "because" of her engagement in this protected activity. 31 U.S.C. § 3730(h)(1); *see also* Md. Code Ann., Health-Gen. § 2-607(b). Here, evidence shows that Defendants fired Simmons after she raised repeated concerns – in writing and in person – that Defendants were planning to falsely report Defendants' ICU bed-count numbers, and very shortly after Simmons's supervisor was informed that Simmons sent an inquiry to the National Healthcare Safety Network ("NHSN") related to those concerns as part of her investigation into the planned FCA/MFCA violations. Does the evidence, at a minimum, give rise to the inference that Simmons engaged in protected activity, thereby presenting a genuine dispute of material fact as to Counts III and IV?

## STATEMENT OF CASE

### I.      Introduction

This is an action under the ADA for disability discrimination and under the FCA and MFCA for retaliatory discharge.

Appellant was diagnosed with a permanent neuromuscular disorder, facioscapulohumeral muscular dystrophy ("FSHD") that causes flares of pain and fatigue due to imbalance of muscle atrophy. The medical disorder causes laxity and lack of function in several muscles, including in Appellant's face, thereby impacting

her ability to physically interact with others. As this medical disability impairs one or more of Appellant's major life functions, including working and motor skills, she is disabled under the ADA.

Between September 2017, and February 19, 2019, Appellant was employed as an Infection Control Practitioner ("IP") with Capital Health. She was responsible for monitoring the infection rates at the facility known as Prince George's Hospital Center. Appellant performed satisfactory work, as evidenced by successfully completing her probationary period and by receiving a favorable evaluation in her only annual review while employed at Capital Health.

After learning of Appellant's disability, her supervisor, Yeo-Jin Lee ("Lee"), and Lee's supervisor, Ingrid Connerney ("Connerney"), had it out for Appellant. Specifically, they discriminated against her by harassing, taunting and intimidating Appellant for her disability. Defendants took employment action adverse to Appellant and, ultimately, terminated her on February 19, 2019.

One of Appellant's job requirements at Capital Health was to collect and report certain information, including hospital-acquired infections and the patient or device days, required to be submitted to the National Healthcare Safety Network (NHSN) monthly. The Centers for Medicare and Medicaid Services ("CMS"), the Centers for Disease Control and Prevention ("CDC"), and the Maryland Health Services Cost Review Commission ("HSCRC") pull data directly from the NHSN

3

site to calculate awards/penalties for hospitals. The better a hospital's performance based on such data, the more money it is allowed to charge payers, including Medicare and private insurance. Thus, manipulation of the data will result in fraud on the government by higher payment rates under Medicare.

Lee instructed Appellant to include the number of post-anesthesia care unit ("PACU") beds in the intensive care unit ("ICU") beds count, even though the PACU beds were in an area separate from the ICU. Appellant reasonably believed, and then confirmed with NHSN, that, even assuming the PACU beds were being used at least 80% of time by ICU patients, such practice is impermissible and that doing so would therefore wrongly manipulate the data and thereby fraudulently impact funding from Maryland and/or the federal government to Defendants. As such, Appellant engaged in protected activity by refusing to engage in the fraudulent practice, vigorously opposing it in writing and in person with Defendants in addition to inquiring with NHSN as to the lawfulness of Defendants' stated plans.

Approximately one month after Lee first instructed Appellant to include PACU beds in the ICU beds count, and barely two weeks after learning that Appellant inquired as to the legality of such action with NHSN, Defendants abruptly decided to terminate Appellant's employment. Notably, Defendants disregarded their Progressive Discipline Policy and have provided inconsistent grounds as the

4

purported legitimate grounds for Appellant's termination. Moreover, evidence contradicts the reasons provided for Simmons's termination.

The district court granted Defendants' Motion for Summary Judgment, holding that: (1) Simmons failed to produce sufficient evidence that Defendants' proffered non-discriminatory reason for termination was pretextual and that they intentionally discriminated against her based on her disability; (2) Simmons failed to present a *prima facie* case of ADA retaliation; and (3) Simmons failed to present any genuine issue that she engaged in FCA- or MFCA-protected activity.[1]

## II.    Statement Of Facts

### A.    Simmons's Background and Disability

Prior to working for Defendants, Simmons had approximately two and a half years of infection prevention experience. JA214-15. Simmons began working for Defendants in September 2017. JA402. She worked as an IP and was responsible for monitoring the infection rates, including producing and overseeing data management related to infection prevention, at the facility known as Prince George's Hospital Center. *Ibid.*; JA195-212.

Simmons has FSHD, which is a progressive degenerative neuromuscular disorder that affects the muscle groups in your body, including your face. JA398-99.

---

[1] This appeal only concerns the first and third holdings.

Simmons originally disclosed her disability to Defendants on her pre-hire paperwork. JA402-03.

In a meeting on November 17, 2017, between Simmons and Lee, her direct supervisor who served as Director of Infection Prevention, and Human Resources ("HR") Manager, Laura Louis-Fils ("Louis-Fils"), Lee told Simmons that she did not like her face and the meeting notes reflect that Lee believed that Simmons was being rude for avoiding eye contact and "giving a blank face." JA401; 219. Lee stated it was an attitude problem and underscored that Simmons's work was stellar. JA401.

Shocked by the comments related to her face and appearance, Simmons arranged a meeting with Louis-Fils a few days later to explain that she had a disability that affects the muscles in her face and can cause her face to appear unfriendly. JA219; 401-02, 404. In response, Louis-Fils suggested that Simmons learn to adapt to Lee's management style or find another job. JA402. In a follow-up email, Simmons explained to Louis-Fils, "I will keep my head down, answer all of [Lee's] questions, and continue to do excellent work, but I have no control over how Yeo-Jin chooses to interpret my face. Which is why I am now afraid to look at her, much less interact with her without a witness present." JA354.

On or around March 2, 2018, while Simmons was in a meeting with Lee and Lee's supervisor, Connerney, Connerney stated that Simmons's face and intonation

6

were offensive to her, and that Simmons's body language was unfriendly and that Simmons appeared tense and anxious and unhappy, which made Connerney feel "uncomfortable," to which Lee nodded her head. JA417-18; 527-30. While Simmons preferred to keep her disability between herself and HR, based on the comments, she felt compelled to inform Connerney and Lee about it to avoid any misperceptions over her appearance and facial expressions. JA416; 418; 524-26.

Following that meeting, Simmons filed a complaint alleging that she felt forced to disclose her disability by Connerney's negative statements about her facial appearance and body language. JA285; 416. HR investigated and informed Simmons thereafter that it could not confirm Simmons's allegations because Connerney claimed that she "was not aware that [Simmons] had a disability." JA285. That is in direct contradiction to Connerney's notes from the March 2, 2018 meeting, which expressly state, "Simmons disclosed condition that makes smiling hard[,]" JA438, and Capital Health's EEOC Position Statement, which states that Simmons disclosed that she "had a medical condition that made smiling difficult" to Connerney. JA592.

## B. Simmons was Treated Differently than her Non-Disabled Colleagues.

Prior to having disclosed her specific disability to Defendants in November 2017, Simmons had a "cordial" and "normal manager/subordinate relationship" with Lee. JA405. However, Simmons noticed thereafter that she was being treated differently than her colleagues. JA429-33. Specifically, Lee commented on

7

numerous occasions that Simmons's face was unfriendly or blank and disengaged, and Lee would give Simmons unrealistic deadlines and alter her workload without warning, unlike with Simmons's co-workers. JA427-28; 432-33; 499.

Lee was unduly negative and critical of Simmons. For example, Lee complained that Simmons allegedly acted disrespectfully for merely seeking useful information in advance of a meeting, JA229, which Connerney noted "was not a bad idea to get," JA227, yet did not criticize or complain about one of Simmons's colleagues for insubordination for chiding Lee about an email Lee sent to Connerney or for doing "a closed hand motion signaling for Lee to shut her mouth" during a meeting. JA413-15. Likewise, Lee complained to HR that Simmons was talking with other people during team meetings, yet Lee never complained about the people who were speaking with Lee because Simmons was purportedly the instigator and Lee is "not going to run to HR for every little thing." JA514-16. In a similar vein, Lee complained that Simmons was not engaged at meetings because she would be working on the computer or looking at papers, even though Lee admitted that she has no idea if the papers Simmons was looking at related to the conversation, and yet Lee did not complain about Simmons's co-workers doing the same thing because they allegedly let her know. JA512-14.

Even Simmons's colleagues noticed that Lee would ignore suggestions by Simmons while accepting the same suggestion if made by a co-worker and, in one

8

case, a co-worker volunteered to pass off Simmons's idea as her own so that Lee would accept it. JA318 (Connerney noted that Simmons's co-worker, Cindy Rosenberger ("Rosenberger"), "[f]eels that Yeo-Jin may not like an idea if Kristin says it, but would not criticize it if [Simmons's co-worker] said so."); JA429-33. Further, shortly after the March 2, 2018 meeting, Simmons noticed that Lee began to carry a notebook with "Kristin Simmons" printed on the front while not carrying similar notebooks for other employees.[2] JA427-31.

The stress caused by Lee's intimidating harassment resulted in Simmons's symptoms worsening. JA422-23; 427-28; 499; 589-90. Simmons made formal requests for reasonable accommodation and presented doctor notes in support thereof. JA419-23. In addition to a sit-stand desk, which Defendants provided, Simmons requested that a third-party be present when she met with Lee and that Lee send Simmons summary emails recapping assignments and the information given during the one-to-one meetings so that sudden deadlines and unrealistic expectations would stop occurring. *Ibid.* On May 3, 2018, Defendants denied that request. *Ibid.* However, after Simmons called the EEOC hotline and obtained legal representation,

---

[2] Lee claimed that she carried notebooks for each employee under her. JA557-58. However, the evidence must be viewed in the light most favorable to Simmons at the summary judgment stage, and Lee's self-serving testimony cannot be given more weight as there is no evidence to corroborate that statement as Lee said she never shared the content of the notebooks with anyone else and claimed to have thrown all the notebooks away so they no longer exist. JA558-59.

Defendants later granted the accommodation of having someone from HR present during Simmons's one-on-one meetings with Lee. *Ibid.*

Shortly after Simmons was granted the accommodation of having an HR representative attend her one-on-one meetings with Lee, Lee ceased doing such meetings with Simmons. JA429-31. Specifically, while Simmons was not terminated until February 2019, following a November 2018 one-on-one meeting with HR representative Veronica Ford ("Ford") present, Lee never held one again with Simmons despite continuing to do so with Simmons's co-workers,[3] *ibid.*, and despite Lee acknowledging that one-on-one meetings are important to "coach [her direct reports] individually" and are a learning opportunity for employees with performance struggles. JA566.

_____

[3] Lee alleged that she continued one-on-one meetings with Simmons until her termination, noting she conducted one-on-one meetings bi-weekly or monthly. JA563-66. However, this self-serving testimony should not be given weight as all favorable inferences must be drawn in Simmons's favor and the facts demonstrate otherwise. Specifically, while Lee testified that she had a one-on-one with Simmons in December, JA565-66, and even wrote in her letter to HR recommending termination that she had such a meeting with Simmons on December 27, 2018, JA328, Lee expressly cancelled her December 27, 2018 one-on-one meeting with Simmons in an email. JA311. Further, Lee testified that she provided Simmons with written recaps of their one-on-one meetings in accordance with her general practice and pursuant to orders from HR, JA285 ("Ms. Lee to ensure meeting minutes provided and will send recaps of 1:1 meetings to Ms. Simmons."); JA328 ("A meeting note followed all 1:1 meetings."); JA560-62 (Lee was instructed by HR to provided meeting recaps to Simmons, and providing meeting recaps was Lee's general practice), yet Defendants failed to provide any evidence countering Simmons's allegation that Lee ceased holding those meetings with Simmons after November 2018.

**C.      Simmons Sought to Prevent Defendants from Defrauding the Government.**

Defendants considered placing ICU patients in a PACU area located in a separate area from the ICU. JA535-36; 585-87. On or about December 28, 2018, Lee tasked Simmons to start collecting patient/device day data for those PACU beds for purposes of ICU "denominator data." JA537-39; 547-48. Under the NHSN guidelines, the number of observed infections (numerator data) is divided by the number of expected infections (denominator data) to yield the standardized infection ratio ("SIR"). JA409-10; 533-34. The CMS, CDC and HSCRC use SIR data collected directly from the NHSN site to determine a hospital's quality-based reimbursement ("QBR"), which provides rewards/penalties for that hospital's reimbursement rates. JA406-07; 409-10; 454-56; 531-34. Specifically, the better a hospital's performance based on such data, the more money it is allowed to charge payers, including Medicare and private insurance. JA406-07. Thus, manipulation of the data will result in fraud on the government by higher payment rates under Medicare.

To categorize the PACU beds as ICU beds, ICU patients needed to be utilizing those beds at least 80% of the time, which is known as the 80/20 rule.[4] JA424; 540-42. However, the NHSN guidelines utilized to calculate the SIR separates units by

---

[4] It is also referred to as the 80 percent rule. JA540-42.

11

their physical location, so, regardless of whether the PACU beds were used by ICU patients at least 80% of the time, it would be inappropriate to include the PACU beds in the ICU bed counts. JA442. Rather, Defendants would need to report the PACU beds as a virtual ICU, separate from the main ICU. JA311; 314; 408; 442; 548-49.

Simmons understood that restriction. *Ibid.* Lee likewise should have been well aware of that as she acknowledged that NHSN's response confirming this restriction to Simmons is "general information that you can find is [*sic*] *a* guideline as well," and that knowledge of the NHSN rules are "critical knowledge for an IP" and that "there's an expectation for IP to have a certain level of knowledge for the NHSN guideline including location mapping." JA543-44. *See also* JA540-41 (Lee testified, "NHSN has a comprehensive guideline, general guideline how to map location. And NHSN has also has the ability – there's a guideline to how to map a temporary location."); JA548-49 (Lee testified that Simmons "brought up a – creating a virtual location which I am very well aware of as a part of NHSN guidelines.").

In assigning Simmons to "modify the CDC existing denominator, collect the form and collect the denominator data every day," JA537-39, Lee specifically mentioned combining any ICU-designated beds in the PACU with the main ICU bed counts. JA408; 442; 546-48 (admitting she engaged in "occasional conversation" and "casual conversation" with Simmons about whether to count the temporary ICU beds in PACU in the main ICU numbers, and that "obviously, combining it would

12

be easier"); JA311 (Simmons wrote to Lee, " . . . I'm not sure it's acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, *as you instructed*." (Emphasis added)). The discussions to combine the bed counts were conversations between Lee and Simmons during IP team meetings and not written. JA425; 545.

Simmons repeatedly objected to Lee's directive to collect data from an area physically separate from the main ICU for combination with the main ICU data. JA311; 328; 442; 549-52. Lee refused to address Simmons's concerns, despite being very familiar with the NHSN guidelines and, according to Lee's own testimony, being something that could easily be determined by a simple review of the NHSN guidelines. JA442; 547-49; 574-75; 580-83. Instead, Lee merely responded that the 80/20 rule had to be satisfied first, JA309; 580-83, which was something already understood to not be the case, JA311, and, more importantly, which was irrelevant as to whether bed/device counts could be combined for ICU units located in physically different locations. JA578-79.

Simmons, who had previously observed Lee lie regarding numbers and other information to surveyors during mock joint commission surveys, JA436, was reasonably concerned that Defendants planned to violate the NHSN rules, which would have legal ramifications for defrauding the government. JA442 ("I would not want our facility to suffer any repercussions for violating NHSN's rules and I am

13

deeply concerned that Yeo-Jin would seemingly readily ignore those rules (*and therefore federal law*), had she not been presented with incontrovertible evidence." (Emphasis added)); JA314 (Simmons forwarded the NHSN response to her co-workers stating, "No, you can't add the PACU-ICU beds into the main ICU denominators to pad the numbers[,]" and "I don't think this is going to end well. I'm forwarding this to you guys as an insurance plan in case [Lee] somehow tries to pin this on me.").

As Lee had suggested that Simmons did not understand the NHSN guidelines in response to Simmons challenging Lee's stated bed counting plans, Simmons sought confirmation from NHSN that her understanding of the rules was correct. JA411; 442. Simmons also felt that she needed NHSN to confirm her understanding, as Lee constantly disregarded any idea or suggestion from Simmons, as even Simmons's co-workers recognized. JA318; 442. NHSN confirmed Simmons's understanding of the rules. JA314; 411; 442.

Simmons immediately emailed the NHSN response to her fellow IPs, JA314, but, conscious of the fact that Lee had criticized Simmons for being "disrespectful" for not agreeing with Lee in the past, JA229, Simmons did not forward the NHSN response to Lee and instead continued her attempts to "tactfully" get Lee to correct her error without having to directly state that Lee was wrong. JA425; 442. Specifically, in an email, dated December 28, 2018, on which Ford was copied,

14

Simmons continued to raise her concern to Lee and specifically asked if there is anything she is overlooking. JA311. And, at a team meeting on January 10, 2019, Simmons again objected when Lee insisted that the PACU data be included with the main ICU data. JA328.

In response to Simmons's December 28, 2018 email objecting to Lee's instruction to add the PACU bed count to the ICU bed count, Lee ignored Simmons's valid concern and instead, as discussed, made a comment about the uncertainty of meeting the 80/20 rule, which is irrelevant as to the legality of adding bed numbers in two physical separate areas. JA309-11; 578-79.

Despite Simmons's attempts to respectfully disagree with Lee and hopes that Lee would address her concerns and change course after reviewing the NHSN guidelines, Lee would not budge, so at meeting on January 14, 2019, Simmons felt she needed to disclose that NHSN confirmed Simmons's understanding that PACU beds could not be included with the main ICU beds to prevent any violation against the government by Defendants. JA442. Lee lost her temper in response. *Ibid.*; JA412. Approximately one month later, and despite never being formally disciplined for anything during her tenure at Capital Health, Simmons's employment was terminated on February 19, 2019. JA429-31; 435.

15

**D.    Simmons's Termination was Not in Accord with her Performance Evaluations and Defendants' Progressive Discipline Policy.**

**1.    Simmons had satisfactory performance reviews.**

Other than two performance review meetings during Simmons's probation period, she had only one annual evaluation while working for Defendants. In her first new employee follow-up meeting, dated November 3, 2017, it was noted that Simmons's strengths are that she is "punctual," has "skills and knowledge on HAI surveillance," and has "teaching/education talent." JA217. The only "areas to improve" were "team communication" and "courtesy and respect for others," *ibid.*, both of which are issues impacted by the perceptions of facial expressions.

In a follow up meeting, dated December 15, 2017, for which Lee decided to extend Simmons's probation period by 30 days, JA221, Lee noted that while Simmons had improved in her "participation and engagement at IP meetings," she did "not feel much improvement in her general attitude[.]" *Ibid.* Lee specifically called attention to Simmons's "non-verbal behaviors."[5] *Ibid.* Any perceived issues at that time were clearly alleviated as Simmons successfully completed her probationary period on January 19, 2018. JA225; 325; 521.

---

[5] While "verbal" behaviors were also noted, the only example of verbal behavior provided was that Simmons makes "comments like since you are my boss, I know I have to deal with it[.]" JA221. While Lee allegedly perceived any such comments in a negative light, they can also be inferred as evidence of Simmons's acknowledgement of and acquiescence to Lee's leadership.

16

In Simmons's only annual performance review, dated September 27, 2018, JA299-300, Simmons received the second highest rating (3 out 4, meaning "[r]esults meet performance standards") for each of the 16 competency categories, which included quality of work, quantity of work, completes assignments within deadlines, adheres to UM Capital and department policies and procedures, and functions as a team member to organize and prioritize responsibilities to complete daily work assignments. *Ibid*. Lee wrote, "Kristin is a self-directed, competent team member in the IP team. She . . . played a vital role during the Medmind surveillance program implementation. I would encourage to continue to develop her skill sets in other areas of IP functions and responsibilities including communication and leadership." JA300. The evaluation indicated that other department leaders were undoubtedly happy with Simmons's performance as they wanted Simmons to take more lead with projects and said that "she's excellent." *Ibid.* Notably, there was no mention in Simmons's annual review of any serious ongoing behavior problems, and nothing else was discussed outside of what Lee and Simmons wrote on the evaluation. JA523-24.

While Connerney "never participated in any written evaluations of Simmons," JA450, she told Simmons when she met with her in early 2018 that Connerney "believed that she was doing a good job related to an infection team." *Ibid.* Connerney testified that outside of her and Lee's alleged complaints about Simmons,

17

she does not recall anyone else making complaints about Simmons. JA451. Further, despite acknowledging that the performance ratings address behavioral conduct, Connerney testified that she was not aware of Simmons's performance ratings at the time of Simmons's termination. JA459.

### 2. Simmons never received any formal discipline prior to her termination.

Defendants have a progressive discipline policy with the stated purpose, "To assist in applying progressive discipline in an equitable manner, to provide rules of conduct for employees, to protect the rights of individuals . . . ." JA464. It specifically states as to its policy – "In most cases, *the disciplinary process is progressive* and is intended to be corrective: not punitive in nature. However, the Corporation reserves the right to immediately terminate an employee *in instances of serious misconduct where escalation is warranted.*" *Ibid.* (emphasis added).

As for procedure, the policy provides that any conduct giving rise to a disciplinary action is supposed to be investigated with "[t]he manager notify[ing] the employee of the date, time, and reason for the investigatory meeting. The explanation should include information to inform the employee of the policy, procedure or rule that has been violated, or the performance criterion that has not been met." JA465. And, "[d]uring the pre-disciplinary investigatory meeting, the employee should be offered an opportunity to provide an explanation for their performance and/or behavior." *Ibid.* Where disciplinary action is warranted, the

18

manager must fill out a "notice of disciplinary action" form and, "[w]henever possible, allow the employee the opportunity to record any remarks he/she may have in the space so indicated on the 'Notice of Disciplinary Action' Form." *Ibid.* "Any additional information and/or supporting documentation provided by the employee must be attached to the 'Notice of Disciplinary Action' Form. The manager shall submit the completed 'Notice of Disciplinary Action' Form and supporting documentation to the Human Resources Department," and "[t]he employee shall be given a copy[.]" *Ibid.*

The policy details the "steps" of the progressive disciplinary process as: (1) formal counseling; (2) written warning; (3) suspension; and (4) termination. JA466. As for termination, the policy specifies that "[a] termination action may be taken for a **serious** offense or repetition of an offense for which the employee has received a suspension, or when the employee has exhausted the progressive discipline progression." *Ibid.* (emphasis in original).

Simmons was terminated in flagrant disregard of Defendants' progressive discipline policy as she was not terminated for a "serious offense" or for "repetition of an offense for which [she had] received a suspension," or had "exhausted the progressive discipline progression." JA429-31. Simmons had never received any "verbal or written warnings" nor formal discipline of any kind prior to her sudden termination. *Ibid.*; JA458. Moreover, contrary to the discipline policy's requirement

19

that an employee be provided the grounds for any disciplinary action and be given an opportunity to explain any allegations of misconduct raised against them, Defendants refused to provide Simmons with the reason for her termination when they fired her. JA435; 519-20.

### E. Defendants' Purported Legitimate, Non-Discriminatory Reasons for Terminating Simmons Were Inconsistent over Time.

Defendants' reasons for terminating Simmons shifted and changed over time. Specifically, at the time of Simmons's termination, despite Simmons asking for the reason and in contravention of Capital Health's discipline policy requiring employees be provided notice of the reason for disciplinary action against them and opportunity to respond thereto, JA465, Defendants refused to provide any reason. JA435; 519-20.

Defendants then submitted a position statement to the EEOC that claimed Simmons "was terminated from employment shortly [after withholding the information she obtained from her NHSN inquiry from Lee in an apparent effort to make Lee look bad] for her consistent inability to work collaboratively with her boss," JA590, and that "the 'bed counting controversy' further demonstrates that [Simmons] cannot work collaboratively with Lee," JA594. The position statement

specifically stated, "The bed counting controversy and ensuing meetings caused Connerney to conclude Simmons should be separated from employment." JA595.

Despite highlighting the NHSN/bed counting controversy in its EEOC Position Statement, Defendants now claim that the termination had nothing to do with Simmons's "concerns about NHSN or calling NHSN." JA452. *See also* JA503 (not mentioning the "bed counting controversy" as one of the reasons for Simmons's termination).

Additionally, Lee's and Connerney's letters to HR recommending Simmons's termination include several issues that were later dropped as reasons for terminating Simmons, and which make it appear that they were grasping for every and any thing to hide the fact that Simmons was terminated for discriminatory reasons. *See infra* SOC[6] § I(F) (noting, *e.g.*, Connerney claimed Simmons's integrity was a major concern supporting her decision to terminate Simmons, but later abandoning that as a justification for Simmons's termination).

### F. Several of Defendants' Justifications for Terminating Simmons are *Post Hoc* Rationalizations and/or Contradicted by the Evidence.

Defendants allege that Simmons had serious ongoing behavior problems that not only persisted, but allegedly worsened, over her tenure at Capital Health, and which were the cause of her termination. JA328-29; 502-03; 575-77; 593-94.

---

[6] Citations to "SOC" refer to the State of the Case section of this Brief.

However, this contention is belied by the fact that Simmons successfully completed her probationary period on January 19, 2018, JA225, and that Simmons's annual evaluation gives no indication of any serious behavior problems, let alone that issues with Simmons "had deteriorated" so badly, JA592, that Lee's supervisor had to get involved and that relationship "did not improve." *Ibid.*; JA299-300.

Another example of a contradiction is that, in Lee's letter to HR recommending termination, Lee complains about Simmons's handling of an incident concerning Medmind on July 10, 2018. JA327. There is no record of this alleged incident anywhere in the record prior to Defendants deciding to terminate Simmons over 6 months later. Meanwhile, in Simmons's annual evaluation, which was approximately two months after the purported occurrence, Lee instead praises Simmons's handling of Medmind with no mention of anything negative. JA300 (Simmons "played a vital role during the Medmind surveillance program implementation").

In demonstrating Simmons's disrespectful behavior that served as grounds for her termination, Defendants highlighted that Simmons would roll her eyes at Lee and "rarely made eye contact[.]" JA326; 440; 571-72; 575-77; 595-96. Putting aside the fact that control over Simmons's eye and facial muscles is directly related to her disability, and that avoiding eye contact is further related to Simmons's disability as she informed HR that she was "afraid to look at" Lee due to Lee's reactions to her

disability's impact on her face, JA354 (" . . . I have no control over how Yeo-Jin chooses to interpret my face. *Which is why I am now afraid to look at her*, much less interact with her without a witness present" (emphasis added)), the <u>only</u> mention of Simmons avoiding eye contact prior to the time Capital Health decided to terminate her was in notes from a meeting on November 17, 2017, between Simmons, Lee and Louis-Fils, JA219, and there is <u>no</u> record of Simmons rolling her eyes at Lee prior to the time that Defendants decided to fire Simmons. Likewise, while Defendants cite Simmons calling one of Lee's ideas "stupid" in support of their decision to terminate her, JA322; 593; 596, there is no record of Simmons having done so until the time Defendants' decided to terminate Simmons and there is no record of Defendants having discussed this allegation with Simmons.

As further support for their decision to terminate Simmons, Defendants note communication concerns, including with her co-workers. JA219; 221; 328. However, Simmons's colleague Kisha Gates ("Gates") told Connerney during a meeting on January 11, 2019, that "[c]ommunication with me and everyone is fine." JA318.

In addition to the fact the Connerney initially claimed the NHSN/bed counting issue was a factor in her decision to terminate Simmons – a statement that she later retracted, *supra* SOC § I(E), Connerney claimed in the conclusion to her letter to HR recommending Simmons's termination that she was "critically concerned about

23

Kristin's objectivity and honesty, as she for example tells me that managers have concerns with Yeo-Jin, which the managers did not collaborate when I approached them. She tells me that she rounds on units alone versus with Kisha, which the other 2 coordinators did not report." JA322-23. Yet, there is no record of Simmons's integrity being a concern throughout her time with Capital Health and, indeed, Defendants do not now claim "honesty" as a grounds to support its termination decision.

Connerney's letter to HR recommending termination also highlights that Gates allegedly claimed that Simmons withheld pertinent information from the NHSN bed counting email from Lee "until 5 minutes into the conversation, whereas Kisha would have done that immediately." JA322. However, that allegation is contradicted by the evidence, which shows that Gates knew the same information as Simmons, since Simmons had immediately forward the NHSN email to Gates and Rosenberger, JA314, yet Gates herself did not say anything earlier in the conversation with Lee.

Defendants' highlight two incidents from February 2018 as detailed examples of the grounds for Simmons's termination – one concerning hand sanitizer and one concerning the sanitation of radiology equipment. JA503-06; 592. However, the disciplinary policy provides that "disciplinary action more than twelve (12) months

24

old will not be considered when determining the appropriate level of disciplinary action to be issued."[7] JA466.

Moreover, as to the hand sanitizer incident, Simmons testified that she "was given very little guidance and zero parameters," JA230, and Lee admitted that if having to choose between no hand sanitizer or an unapproved alternate, an employee on the floor should use the unapproved alternative. JA512. Remarkably, while Lee acknowledged that the employee using the sanitizer was obligated to follow the same process as Simmons in finding an alternative, she only criticized Simmons for allegedly not following the hospital process and saw no reason for the other employee to be criticized. JA507-11.

As to the radiology equipment, the EEOC Position Statement claims, "When Ms. Lee recommended a meeting to better understand the issue, Ms. Simmons said that a meeting was not necessary[.]" JA592. However, the evidence regarding that incident does not corroborate that statement. JA229; JA227. Moreover, while Defendants cite Simmons's efforts to collect useful data in advance of the meeting as an example justifying Simmons's termination for being disrespectful to Lee, JA229, Connerney noted that it "was not a bad idea to get [that] data." JA227.

---

[7] Not to mention Simmons never received any discipline for either of these incidents. JA429-31; JA458; JA507.

25

Lee, despite acknowledging that employees have an obligation to follow the policies of their employer such as the progressive discipline policy, JA56-70, and citing examples of supposed instances in which Simmons had not followed Defendants' policies, such as the hand sanitizer incident, as grounds for terminating Simmons, JA503-06; 592, testified that she did not need to adhere to Capital Health's progressive discipline policy with Simmons because Lee "do[es] not believe personally following what the word-to-word disciplinary action is the effective way to managing or building a team," and that "effort [to assist Simmons] was made through the numerous meetings, discussions and efforts." JA567-70.

Connerney likewise claimed that it was immaterial that, in violation of Defendants' progressive discipline policy, Simmons was never even issued a verbal or written warning prior to her termination because it "was a year-long issue." JA457-58. However, while claiming that they were actively working to coach Simmons in collaboration with HR, the record shows that HR's involvement was due to Simmons's complaints about Defendants' discriminatory treatment of her and *not* because Defendants were genuinely seeking to assist Simmons with any alleged serious behavior problem:

- "Feb 14, 2018. Met with Ingrid Connerney, VP & CQO, and Kristin. Ingrid facilitated the conversation between Kristin and me *regarding communication issues brought up by Kristin*." JA325 (emphasis added);

26

- May 7, 2018 meeting with HR *regarding Simmons's request for accommodations*, including not to have one-on-one meetings with Lee. JA325-26;

- "June 12, 2018. Met with Veronica Ford, VP of HR, *per her request [regarding Simmons's request for accommodations]*." JA326 (emphasis added);

- "Jun 26, 2018. Met with Regina Brown, HR Employee & Labor Relations Advisor, *per her request. Regina shared that HR received a letter from Kristin regarding communications between her and I*." JA326 (emphasis added); and

- August 27, 2018, *because of Simmons's request for accommodations*, Lee meets with HR and the corporate legal advisor regarding having an HR representative present at Lee's one-on-one meetings with Simmons. JA328.

In Lee's timelines created for recommending Simmons's termination to HR, she highlights as an example supporting Simmons's termination that on July 13, 2018, during a one-on-one meeting with Simmons, Simmons said that "her troubles [are] . . . mainly coming from [Lee's] 'management skills and style,'" and that Simmons feels "micromanaged" and expressed "concerns about the IP huddle" and also said that Lee "does not give enough time for her assignments." JA288; 293-94. Yet, in Lee's email to Simmons recapping the meeting, which Lee was required to

27

provide as an accommodation for Simmons, none of those items were listed. JA2977.

Further inaccuracies and lack of substantiation for the alleged grounds for Simmons's termination in the EEOC Position Statement include that:

- Defendants claim that following the hand sanitizer and radiology equipment incidents noted above, "Simmons [*sic*] interactions with Ms. Lee had deteriorated to the point where Ms. Connerney . . . felt the need to intervene." JA592.

  - This enflamed language hardly portrays the fact that the meeting with Connerney occurred because of Simmons making a complaint to HR based on Lee's treatment of her, not the other way around.

- Defendants claim that "Simmons's disregard for Lee also is reflected in the tone of her emails," and gives as an example, "[w]hen Lee asked why Simmons had not requested time off for a PTO day, Simmons responded by relaying that Lee had not requested her leave by putting her name on the calendar either." JA594.

  - This misconstrues Simmons's email which simply notes that she had "put [her] name on the calendar with the understanding that [Lee] was checking it regularly." JA302. Simmons continued, "On the 24th when one of us attended the huddle, Ingrid stopped by and asked where we

28

were. All three of us were here and none of us knew you would not be here because your name was not on the calendar. Cindy, Kisha and I tried to locate an email where you asked us to cover huddle and were unable to find one." *Ibid.* Simmons concluded, "My apologies. If you would prefer, I'll take yesterday as an unscheduled day." JA303. Lee responded that the "[t]eam calendar is a complimentary communication tool for the team" that she does not "routinely check," and then noted, "I did let all of you know that I was taking a PTO day on Mon, 12/24 during the last IP meeting when we talked about schedule around holidays, but it was my oversight that not sending a reminder email like I do most of the time. Yes, reminder communication helps!" JA302. Again, Capital Health's sensational language intentionally misleads as to the overall tone of the email, and, notably, Lee did not claim that Simmons's tone was rude in her response to Simmons's email. The same is true with the two other emails highlighted in Capital Health's position statement, both of which Defendants tellingly did not include as an exhibit to its Motion for Summary Judgment.

- Defendants accuse Simmons of sending an email to Connerney on January 14, 2019, that "intentionally mischaracterized the events surrounding the bed counting controversy. Specifically, Ms. Simmons told Ms. Connerney that

Ms. Lee had not addressed her reporting concerns, which was untrue. She also confirmed the characterization by her coworkers that she had intended to blindside Ms. Lee during the meeting." JA594.

- o Contrary to Defendants' statement to the EEOC, they have produced no evidence showing that Lee addressed Simmons's concern over Lee's stated intention to simply add the PACU beds to the main ICU bed count. Thus, Simmons's statement was not untrue. Further, far from "confirming" that Simmons sought to "blindside" Lee with the information from NHSN, in light of the fact that Lee would ignore suggestions by Simmons, JA318; 429-31; 432-33, and because Simmons had been accused of trying to prove she knew more than Lee, JA589, Simmons rather explained that she "had tried numerous times to tell [Lee] that she was mistaken *in a polite, tactful way* that would allow her to save face, but it would appear that my word is insufficient impetus for her to reevaluate her decisions. It's because I know this that I had to go to the NHSN for backup." JA442 (emphasis added).

- Defendants declare that "Simmons likewise did not respond to team emails and, for team projects, sent the final product to other departments without Lee's review." JA590.

o The only record prior to Simmons's termination concerning "not responding to team emails" was in notes from a meeting on November 17, 2017, between Simmons, Lee and Louis-Fils. JA219. And despite using plural for "team projects" for which Simmons sent the final product without Lee's review, there is only <u>one</u> such alleged incident in the record and, like many of Defendants' examples of supporting evidence to terminate Simmons, it was early on in Simmons's employment at Capital Health. JA219; 517-18.

## SUMMARY OF ARGUMENT

The district court committed several legal and factual errors in awarding Defendants summary judgment. In concluding that Simmons presents no genuine dispute of material fact as to whether Defendants' proffered reasons for taking adverse employment actions against Simmons was pretext, the district court incorrectly ignored evidence and viewed the facts and reasonable inferences in the light most favorable to the moving party, rather than Simmons, the non-moving party.

Notably, the district court: (i) failed to address evidence of discrimination leading up to Simmons's termination; (ii) failed to give due weight to Simmons's testimony, as the non-moving party, over Defendants' self-serving testimony, much of which is contradicted by the evidence, including the fact that Simmons's annual

31

review makes no mention of any serious ongoing behavior problems; and (iii) failed to give weight to the fact the Defendants palpably violated their progressive discipline policy in deciding to terminate Simmons's employment.

The district court also erred in finding that the evidence fails to show that Simmons engaged in protected activity to support her FCA/MFCA retaliation claims. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015). Yet, that is exactly what the district court did here in finding that Simmons had no objectively reasonable belief that Defendants were soon to violate the FCA/MFCA.

Specifically, in doing so, the district court improperly found: (i) that Simmons's inquiry to NHSN was not part of her effort to stop an FCA/MFCA violation; (ii) that Simmons could not have an objectively reasonable belief that Defendants will soon violate the FCA/MFCA because she had not yet collected the data to be used in a future report to the government; (iii) that there was "no evidence to corroborate [Simmons's] self-serving testimony" when, not only was there such evidence, but, on the flip side, there is no evidence to support Defendants' self-serving testimony; and (iv) that Simmons could not have an objectively reasonable belief that Defendants will soon violate the FCA/MFCA because, in response to Simmons raising objections to Lee's plan to add the PACU and ICU bed numbers,

32

Lee ignored that concern and instead made a comment about the uncertainty of meeting the 80/20 rule, which is irrelevant as to the legality of her proposal to add bed numbers in two physically separate areas.

While this Court "is not equipped to correct every perceived error coming from the lower federal courts," it should intervene here because the district court's ruling "reflects a clear misapprehension of summary judgment standards." *Tolan v. Cotton*, 572 U.S. 650, 659 (2014). This Court should reverse the district court's ruling and remand for further proceedings.

## ARGUMENT

### I.   Standard Of Review

The Court review[s] a district court's grant of summary judgment *de novo*, "applying the same legal standards as the district court[.]" *Kritter v. Mooring*, No. 24-1158, 2025 U.S. App. LEXIS 12066, at *7 (4th Cir. May 19, 2025) (internal quotations omitted). Accordingly, the Court "'construe[s] all facts and reasonable inferences in the light most favorable to the nonmoving party' and ask[s] whether genuine disputes of material fact preclude judgment as a matter of law." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254 (4th Cir. 2025) (quoting FED. R. CIV. P. 56(a)). This Court underscored "that 'the aim of summary judgment is not to determine the exact strength of a case and dispose of socalled [*sic*] weak cases, but instead to determine whether a rational jury *could* find in the plaintiff's

33

favor.'" *Ibid.* (quoting *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 412 (4th Cir. 2022) (emphasis in original)).

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, 10B CHARLES ALAN WRIGHT & ARTHUR D. MILLER, FEDERAL PRACTICE & PROCEDURE § 2739 (4th ed. 2024) (observing that "[t]he burden does not shift to the opposing party" "if the movant fails to meet the burden of showing the absence of any genuine issue of material fact"). In the present case, at a minimum, material disputed facts exist regarding Appellant's claims, so summary judgment is inappropriate.

## II.    The District Court Erred By Dismissing And Weighing Evidence Contrary To The Mandates Of Rule 56.

The district court erred by failing to consider all of the evidence in the record and by viewing the facts and reasonable inferences in the light most favorable to Defendants. The district court also grossly erred by discounting Simmons's testimony. The following are examples of the district court's misapplication of the summary judgment standard recitation of the facts.

First, in determining there was no pretext for Defendants' adverse employment actions, the district court only considered Simmons's termination when analyzing whether to grant summary judgment on Simmons's discrimination claim. JA634-35. This utterly ignores things such as Simmons's testimony that, following

34

Lee being required to have an HR representative present at one-on-one meetings with Simmons as an accommodation, Lee ceased having such meetings with Simmons after November 2018, even though Simmons continued to work at Capital Health for another three months, JA429-31, and even though Lee claims that Simmons had on-going serious behavior problems and testified that one-on-meetings are important to "coach [her direct reports] individually" and are a learning opportunity for employees with performance struggles. JA566. Defendants produced no evidence to counter Simmons's claim that Lee ceased holding one-on-one meetings with Simmons while continuing to do so for Simmons's co-workers.

Furthermore, as to Simmons's ADA discrimination claim, the district court accepted Capital Health's characterization of Simmons's performance issues, ignoring several facts and drawing all reasonable inferences in Defendants' favor, in finding that there are no triable facts capable of proving Capital Health's reason for terminating Simmons was mere pretext. *See supra* SOC § III (discussing evidence demonstrating pretext is a triable issue). For example, the district court: (1) ignored that essentially all of the evidence from Defendants comes from the two people who Simmons alleges were gunning for her – Lee and Connerney – whereas no one else at Capital Health complained about Simmons; (2) did not give weight to the fact much of Defendants' evidence justifying the termination decision was created around the time of that decision despite claiming Simmons had serious ongoing

35

behavior problems throughout her roughly year-and-half tenure at Capital Health; (3) did not give adequate consideration to the fact that Simmons's annual evaluation made no mention of Simmons's alleged ongoing serious behavior problems; (4) stated as undisputed fact that Simmons did things such as roll her eyes when there is no record of such alleged behavior problems prior to Defendants' decision to terminate Simmons; and (5) failed to give proper weight to the fact that Defendants violated their own progressive discipline policy. *Id.*

As to Simmons's FCA/MFCA retaliation claim, the district court accepted Lee's and Connerney's unsupported testimony that Lee never instructed Simmons to add the PACU bed count to the main ICU bed count numbers while completely discounting Simmons's testimony and overlooking Lee's testimony admitting that she discussed including the PACU bed numbers with the ICU bed counts as well as overlooking the contemporaneous documents expressly stating that Lee discussed adding those numbers to Simmons. *See supra* SOC § III. The district court thus erred by not viewing the evidence in the light most favorable to the non-movant — Simmons — and drawing all reasonable inferences in her favor. *Ray v. Roane*, 93 F.4th 651, 655 (4th Cir. 2024) (noting that a court may not "weigh the evidence or make credibility determinations" because "[t]hat function is reserved for a jury, and only if the movant shows that there is no genuine dispute as to any material fact may summary judgment be awarded." (Internal quotations omitted)).

36

**III.    The District Court Erred In Granting Summary Judgment On Count I Because There Are Triable Facts Capable Of Proving Capital Health's Reasons For Terminating Simmons Are Pretext.**

The ADA makes it unlawful for employers to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Disability discrimination may be proved by direct and indirect evidence, or through the *McDonnell Douglas* burden-shifting framework. *Jacobs*, 780 F.3d at 572 (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003)). Under *McDonnell Douglas*, if the plaintiff makes a *prima facia* case, the burden then shifts to the defendant to produce evidence that it acted with a legitimate, nondiscriminatory reason. *Wannamaker-Amos*, 126 F.4th at 257. If the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the proffered legitimate reason was mere pretext. *Ibid.*

This Court has acknowledged that "[a] *prima facie* case and evidence of pretext raises a sufficient inference of discrimination to entitle a plaintiff to survive a motion for summary judgment." *Jacobs*, 780 F.3d at 574. Here, a *prima facie* case was assumed by Defendants and the district court, so Simmons need only demonstrate that pretext can be inferred by the evidence to defeat summary judgment. The district court erred in finding she failed to do so.

"A plaintiff may demonstrate pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could

37

rationally find them unworthy of credence." *Fordyce v. Prince George's Cnty.*, 43 F. Supp. 3d 537, 550 (D. Md. 2014) (internal quotations omitted). Likewise, if "a reasonable fact-finder could infer something 'fishy'" about an employer's claims under the circumstances, it may suggest pretext. *Dorriz v. District of Columbia*, 133 F. Supp. 3d 186, 199 (D.D.C. 2015).

Among other methods, a plaintiff may prove pretext by demonstrating that the asserted justifications, even if true, are *post hoc* rationalizations invented for the purpose of litigation, *Jacobs*, 780 F.3d at 576 (citation omitted). In *EEOC v. Sears Roebuck*, this Court explained, "Indeed, the fact that [defendant] has offered different justifications at different times for its failure to hire [plaintiff] is, *in and of itself*, probative of pretext." 243 F.3d 846, 852-53 (4th Cir. 2001) (emphasis added). A jury may also infer pretext from: (1) an employer's deviation from normal procedures, (2) the citation of purported issues that arose in a prior month, or (3) the failure to provide coaching on purported performance issues. *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 383 (4th Cir. 2022). Importantly, once the plaintiff offers such circumstantial evidence, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Sears*, 243 F.3d at 852-53.

All the above-mentioned circumstances exist in this case. Without warning and in violation of Defendants' progressive discipline policy, Defendants terminated Simmons's employment with no reason provided and no opportunity for Simmons

to respond to any alleged wrongdoing. *Supra* SOC § I(D)(2). "Evidence that a company failed to follow its own disciplinary policies in firing an employee can [ ] be probative of pretext . . . because an employer's extreme overreaction to a minor infraction may suggest that the relevant decisionmaker was looking for a reason to get rid of [the plaintiff] on discriminatory grounds." *Wannamaker-Amos*, 126 F.4th at 260-61. *See also Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990) (employer's failure to follow established procedures for handling perceived deficiencies in the performance of its employees sufficed as pretext evidence for employee fired for performance deficiencies); *Stiles v. General Elec. Co.*, No. 92-1886, 1993 U.S. App. LEXIS 2870, at *11-12 (4th Cir. Feb. 12, 1993) (deviation from layoff selection policy evidence of pretext). The district court failed to address this key fact.

Further, the district court ruled that Capital Health's justification for terminating Simmons's employment was for legitimate and non-discriminatory reasons as a matter of law, despite evidence showing those reasons changed over time and were contradicted by other evidence. JA635; *supra* SOC § I(E). While providing no reason to Simmons at the time of her termination, Defendants alleged in their EEOC Position Statement, as well as in letters sent by Lee and Connerney to HR, that Simmons was fired for the bed counting incident, which arose in the prior month, and exaggerated "attitude" issues, many for which are related to Simmons's

39

disability and/or there is no contemporaneous documentation. *Supra* SOC § I(E). Lee's and Connerney's letters to HR recommending termination also list several untimely and minor incidents, several of which are mischaracterized. *Id*. Defendants have since changed their tune and now assert that the bed counting issue was not a factor in their decision to terminate Simmons, and that Simmons was fired solely for behavioral problems. *Id*.  Because Defendants "offered different justifications at different times," *Sears*, 243 F.3d at 852, a reasonable jury could conclude that Defendants' shifting, conflicting reasons for firing Simmons are sufficient to demonstrate pretext and prevail on her claim. *See Wannamaker-Amos*, 126 F.4th at 258 ("Although an employer may have multiple legitimate reasons for firing an employee, its effort to retract certain reasons initially offered by the decisionmaker may suggest that none of those reasons were ever the true reasons and instead were pretext for discrimination." (Citation omitted)). The district court overlooked this pertinent fact.

The district court also ignored Defendants' lack of contemporaneous documentation. *Supra* SOC § I(F) (*e.g.*, documents created at the time of Simmons's termination suddenly alleging she had problems with rolling her eyes and calling Lee's ideas stupid and had ongoing serious behavior problems that were worsening with time). The absence of contemporaneous documentation of the purported issues shows pretext. *Smith v. CSRA*, 12 F.4th 396, 421 (4th Cir. 2021) (citation omitted);

40

*Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502-03 (4th Cir. 2001) ("The jury could have concluded that the last-minute documentation of . . .job performance supports the inference (of) contrived . . . performance deficiencies . . . in order to create the appearance of a nondiscriminatory reason"); *cf. Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 218-19 (4th Cir. 2016) (lack of contemporaneous documentation supporting employer's purported reason creates genuine issue of material fact as to pretext).

The district court further ignored evidence contradicting Defendants' reasons for terminating Simmons, *supra* SOC § I(F), instead stating that "an employment discrimination claim is not a vehicle for substituting judgment of a court for that of the employer." JA633 (internal quotations omitted). But the not "substituting judgment of a court for that of the employer" standard does not eliminate consideration of conflicting evidence of pretext. Rather, as the *Feldman* Court explained, which the district court also noted, courts do not "decide whether an employer's reason for terminating an employee was wise, fair, or even correct, *so long as it truly was the reason* for the employee's termination." *Ibid.* (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 350 (4th Cir. 2014)) (emphasis added)). The district court was required to consider evidence of pretext, including the conflicting evidence regarding Simmons's performance, to determine if a

41

reasonable jury could rationally find Defendants' termination of Simmons was unlawful.

Moreover, "[s]ummary judgment is not appropriate when questions about the credibility of key witnesses loom large and the evidence could permit a trier-of-fact to treat their testimony with skeptical scrutiny." *Jacobs*, 780 F.3d at 576-77 (internal quotation omitted). Evidence shows that the credibility of Lee and Connerney, both key witnesses and decision-makers in Simmons's termination, are in question. *Supra* SOC § I(D)-(F). For example, while Connerney noted that Simmons disclosed that she had a disability in a meeting in March 2018, JA438; 592, she later told HR that she had no such knowledge in response to Simmons's discrimination complaint. JA285. Connerney also claimed that Simmons was terminated for reasons including the NHSN/bed counting controversy but later retracted that allegation. JA452; 595. In addition to evidence from Lee contradicting itself (*e.g.*, allegations concerning the Medmind matter), Simmons testified that she observed Lee lie on the job. JA436.

Once Simmons provides evidence of pretext, only the jury should decide which side wins. *EEOC v. McLeod Health, Inc.*, 914 F.3d 876, 882 (4th Cir. 2019) (a court's job is not to decide "which party's evidence is stronger or more persuasive"); *Jacobs*, 780 F.3d at 568-69 ("'Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits.'") (quoting 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER ET

42

AL., FEDERAL PRACTICE & PROCEDURE § 2728 (3d ed.1998)). This case turns on Lee's and Connerney's states of mind, and only a jury can determine that. *Ballinger v. N.C. Agric. Extension Serv.*, 815 F.2d 1001, 1005 (4th Cir. 1987) ("[S]ummary judgment is seldom appropriate in [employment discrimination] cases wherein particular states of mind are decisive as elements of [a] claim or defense." (Internal quotation omitted)).

Summary judgment should not be granted on Count I as Simmons proffers evidence sufficient for a reasonable trier of fact to conclude that Defendants' explanation for her termination is false or unworthy of credence, and that discrimination was the true reason for the adverse employment action. *EEOC v. Mfrs. & Traders Tr. Co.*, 402 F. Supp. 3d 201, 234 (D. Md. 2019). *See id.* at 235 ("Accordingly, if a plaintiff presents evidence or legitimate argument that could persuade a rational fact finder to disbelieve the defendant's justification for its employment decision, summary judgment in favor of the employer is not appropriate.").

**IV.    The District Court Erred In Granting Summary Judgment On Counts III And IV Because There Are Triable Facts Capable Of Proving Simmons Engaged In Protected Activity.**

To sufficiently plead an FCA[8] retaliation claim under Section 3730(h),[9] an employee must allege facts that support the "reasonable inference" that: "(1) he engaged in protected activity; (2) his employer knew about the protected activity; and (3) his employer took adverse action against him" because of the protected activity. *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). Here, the district court also erred in holding that Simmons did not establish a *prima facie* case of retaliation under the FCA based on its finding that the evidence fails to give rise to a triable fact capable of proving that Simmons engaged in protected activity.

The FCA recognizes two types of protected activity "(1) acts 'in furtherance of an [*sic*] FCA action; and (2) 'other efforts to stop' one or more FCA violations." *Graham v. Honeywell Int'l, Inc.*, No. 21-0310, 2022 U.S. Dist. LEXIS 159639, at *13 (D. Md. Sept. 2, 2022) (quoting 31 U.S.C. § 3730(h)(1)). A plaintiff need not prove an underlying FCA violation to state a plausible claim for FCA retaliation.

---

[8] As noted by the district court, judges look to FCA case law for guidance when addressing claims brought under the MFCA. JA638. As such, the claims under the FCA and MFCA are being addressed jointly here, and the term "FCA" is being used to refer to both collectively.

[9] The equivalent anti-retaliation provision for the MFCA is found in Md. Code Ann., Health Gen. § 2-607(a).

44

*Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 416 n.1 (2005). This is because "retaliation can occur while employees are investigating or collecting information about a possible fraud, before they have put all the pieces of the puzzle together." *Graham*, 2022 U.S. Dist. LEXIS 159639, at *13-14 (internal quotations omitted). *See also Wilson*, 545 U.S. at 416 (Section 3730(h) protects an employee's conduct "even if the target of an investigation or action to be filed was innocent.").

The making "other efforts to stop" an FCA violation prong "is subjected to an objective reasonableness standard for protected activity," *Hearn v. Edgy Bees Inc.*, No. 21-2259, 2023 U.S. Dist. LEXIS 72677, at *17 (D. Md. Apr. 25, 2023) (citing *Grant*, 912 F.3d at 201), meaning that the facts must permit "the inference that a plaintiff's actions were motivated by an objectively reasonable belief that the employer is violating, *or will soon violate*, the FCA." *Grant*, 912 F.3d at 201 (emphasis added).

Here, there are several issues of material fact as to whether Simmons had an objectively reasonable belief that Capital Health was soon going to violate the FCA. *Supra* SOC § I(C). Simmons provides evidence that, if believed, a reasonable jury could conclude she suspected Defendants planned to commit fraud against the government. Specifically, Simmons testified that she has not only seen Lee lie to surveyors during mock joint commission surveys about "HAI prevention initiatives

45

and how we were attempting to lower our CLABSI and CAUTI rates, and education that we were doing," JA436, but that she was improperly instructed by Lee to add the PACU-ICU and ICU bed numbers, which Simmons reasonably believed would result in Defendants padding their numbers to get a more favorable QBR, and, as such, she raised concerns about this practice to management in person and in emails. *Grant*, 912 F.3d at 202 (finding that employee had an objectively reasonable belief that the employer was violating the FCA when employee had personal knowledge of the employer's contract fraud and reported the specific illegal conduct to his superiors).

Further, in response to Lee stating that the PACU bed counts would be added to the main ICU bed counts, Simmons attempted to stop the FCA violations by refusing to engage in the criminal activity, by confirming with NHSN as to the legality of the proposed actions as part of her investigation, and by immediately and repeatedly objecting to the perceived fraudulent conduct – padding the denominator number used to calculate the SIR in order to fraudulently obtain a QBR resulting in Defendants receiving a reward allowing them to charge payers, including Medicare and private insurance, more money. *Supra* SOC § I(C).

Simmons, in an email to her co-workers forwarding the NHSN response, stated, "No, you can't add the PACU-ICU beds into the main ICU denominators to pad the numbers[,]" and "I don't think this is going to end well. I'm forwarding this

to you guys as an insurance plan in case [Lee] somehow tries to pin this on me." JA314. Likewise, Simmons wrote to Connerney, "I would not want out facility to suffer any repercussions for violating NHSN's rules and I am deeply concerned that Yeo-Jin would seemingly readily ignore those rules (*and therefore federal law*), had she not been presented with incontrovertible evidence." JA442 (emphasis added).

The evidence corroborates Simmons's testimony as Capital Health's position statement to the EEOC acknowledges that Lee "commented that it would be convenient if these beds [temporary ICU beds located in the PACU] could be included with the ICU beds for the purpose of reporting[.]" JA594. Lee herself admits she had such conversations in-person with Simmons. JA545-48. Moreover, Simmons wrote in a contemporaneous email to Lee, " . . . I'm not sure it's acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, *as you instructed,*" JA311 (emphasis added)). Simmons also wrote in a contemporaneous email to Connerney that:

- "When we were first talking about the possibility of converting the beds, *Yeo-Jin mentioned that she thought that we'd just add those numbers into an existing unit's monthly totals*. Knowing that NHSN does not permit that, as the units are in separate physical locations, I questioned whether we would allowed to do that. My concerns were dismissed." JA442 (emphasis added);

47

- "*I have asked her repeatedly since that time to please check the rules and make sure that it's OK to add the PACU numbers into ICU.* Finally, as I was getting nowhere with Yeo-Jin, I sent an email to the helpline at NHSN, outlining the scenario and asking for advice. . . . After receiving their reply, I asked Yeo-Jin one more time in an email on which Veronica Ford was copied to please check the NHSN rules and make sure we're following them. That was on December 28th. In her response, she addressed other parts of my email but did not address my NHSN concerns." *Ibid.* (emphasis added);

- "At our morning huddle last Thursday, *Yeo-Jin once again expressed that her intention is simply to add the PACU numbers into another unit.* I finally had to tell her directly that it is not allowed. She again expressed doubt in my ability to read and understand the NHSN guidelines, so I was forced to tell her that I had, in fact, already contacted NHSN for advice and they had agreed that Yeo-Jin's plan was not acceptable. At this point, Yeo-Jin lost all composure. She started yelling at me and gesticulating wildly . . . , accusing me of keeping information from her and not communicating and acting like I 'know everything.'" *Ibid.* (emphasis added).

The district court erroneously gave no weight to this evidence – stating "there is no evidence to corroborate [Simmons's] self-serving testimony [that Lee's plan was to add the PACU bed data into the ICU numbers]." JA639. To the contrary,

48

other than Lee's and Connerney's self-serving testimony, there is no evidence corroborating Defendants' allegation that Lee never told Simmons that her plan was to combine the numbers of physically separate spaces. Clearly, these conflicting accounts preclude summary judgment. *See United State v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (stating that credibility determinations are for the trier of fact). Further, although Simmons is not relying solely on her own testimony, the notion that her testimony counts less than Lee's and Connerney's contradicts the core principle of Rule 56 that a non-movant's testimony counts more than a movant's testimony. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("[A]t the summary judgment stage, we must view the record in the light most favorable to . . . the non-moving party").

The district court further found that Simmons could not have an objectively reasonable belief that "Lee intended to manipulate the data she asked [Simmons] to collect" because, in response to Simmons's December 28, 2018 email objecting to Lee's instruction to add the PACU bed count to the ICU bed count, Lee stated "that the bed utilization data needed to be collected given the 'uncertainty'" of meeting the 80/20 rule. JA640. This analysis is flawed because: (1) it does not acknowledge that Lee's response completely ignored Simmons's bed counting concerns[10] as Lee

---

[10] As noted, this NHSN guideline is basic information with which Lee should have been familiar and, in any event, easily could have looked up. JA540-41; 543-44; 548-49; 555-56.

only responded as to the 80/20 rule, JA309-11, which is irrelevant as to the legality of her comments to Simmons about adding bed numbers in two physically separate areas, JA578-79; and (2) it does not take under consideration why, if Lee was so concerned with addressing the 80/20 rule prior to deciding how the data was to be reported, Lee admitted that she discussed adding the PACU bed count to the ICU bed count with Simmons. JA546-48; 594.

Accordingly, summary judgment should not be granted on Counts III and IV as there is sufficient evidence for a reasonable trier of fact to conclude that Simmons's belief that Defendants were violating the FCA was objectively reasonable.[11]

---

[11] While the district court did not discuss the other elements to a *prima facie* case of retaliation under the FCA, and therefore those elements cannot support judgment as a matter of law on Simmons's FCA-based claims, the evidence undoubtedly supports a reasonable inference as to the existence of the two remaining elements – that Defendants knew about Simmons's protected activity (since Simmons directly told Defendants about it, *supra* SOC § I(C)), and that Defendants took adverse action against Simmons because of the protected activity (as Simmons was fired within weeks of the protected activity, *ibid*). *See*, *e.g.*, *Weihua Huang v. Rector & Visitors of the Univ. of Va.*, 896 F. Supp. 2d 524, 554 (W.D. Va. 2012) ("While a record of friction between Dr. Huang and Defendants certainly exists, the temporal proximity of Dr. Huang's allegations regarding misappropriation of grant funds and his non-renewal could lead reasonable jurors to conclude that Defendants' stated rationales for their decision to issue the non-renewal letter were merely a pretext for otherwise retaliatory action.").

50

## CONCLUSION

Appellant respectfully requests that this Honorable Court vacate the district court's grant of summary judgment against her on Counts I, III and IV.

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to the Federal Rules of Appellate Procedure 34(a) and U.S. Court of Appeals for the Fourth Circuit Local Rule 34(a), Appellant, Kristin Simmons, respectfully requests oral argument in her case because oral argument will aid the Court in deciding the issues presented in this appeal.

Dated: July 7, 2025

Respectfully submitted,

*/s/ Joyce E. Smithey*
Joyce E. Smithey, Esq.
Reuben W. Wolfson, Esq.
Liesel J. Schopler, Esq.
Smithey Law Group LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com
liesel.schopler@smitheylaw.com

*Counsel for Plaintiff-Appellant Kristin Simmons*

51

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,965 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in proportionally-spaced typeface using Microsoft Word in 14 point Times New Roman font.

Dated: July 7, 2025

*/s/ Joyce E. Smithey*
Joyce E. Smithey

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of Court. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: July 7, 2025

*/s/ Joyce E. Smithey*
Joyce E. Smithey
