## CASE NO. 25-1430

## IN THE
United States Court of Appeals
for the
Fourth Circuit

**KRISTIN SIMMONS,**

*Plaintiff-Appellant,*

**v.**

**UM CAPITAL REGION HEALTH, INC; DIMENSION HEALTH CORPORATION d/b/a UM CAPITAL REGION HEALTH INC,**

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Maryland
In Case No. 1:21-cv-02074-MJM
Honorable Matthew J. Maddox, U.S. District Court Judge

## BRIEF OF DEFENDANT-APPELLEE

Alison N. Davis
Morgan L. Kinney
LITTLER MENDELSON, P.C.
815 Connecticut Ave NW, Suite 400
Washington, D.C. 20006
202.842.3400
Andavis@littler.com
mkinney@littler.com

*Counsel For Defendant-Appellee*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1430__        Caption: __Kristin Simmons v. UM Capital Region Health, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Dimensions Health Corporation__
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                        ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                   ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☑YES ☐NO
If yes, identify entity and nature of interest:

No other corporation, unincorporated association, partnership or other business entity, has a financial interest in the outcome of this litigation, except to the extent that AIG might potentially have an obligation as Defendant-Appellee's insurer to provide coverage in connection with one or more of Plaintiff-Appellant's claims

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Alison N. Davis_      Date: 5/14/2025

Counsel for: Dimensions Health Corporation

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __25-1430__          Caption: __Kristin Simmons v. UM Capital Region Health, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__UM Capital Region Health, Inc.__
(name of party/amicus)


who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:


12/01/2019 SCC                                   - 1 -

4.	Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?   ☑YES☐NO
If yes, identify entity and nature of interest:

No other corporation, unincorporated association, partnership or other business entity, has a financial interest in the outcome of this litigation, except to the extent that AIG might potentially have an obligation as Defendant-Appellee's insurer to provide coverage in connection with one or more of Plaintiff-Appellant's claims

5.	Is party a trade association? (amici curiae do not complete this question)   ☐YES☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.	Does this case arise out of a bankruptcy proceeding?   ☐YES☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.	Is this a criminal case in which there was an organizational victim?   ☐YES☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____*Alison N. Davis*_____     Date: _____5/14/2025_____

Counsel for: _____UM Capital Region Health, Inc._____

- 2 -

| Print to PDF for Filing |

## TABLE OF CONTENTS

Page

I.  JURISDICTIONAL STATEMENT ...............................................................1

II.  STATEMENT REGARDING ORAL ARGUMENT ....................................1

III.  STATEMENT OF ISSUES ........................................................................1

IV.  STATEMENT OF CASE ...........................................................................2

V.  STATEMENT OF THE FACTS .................................................................3

    A.  The Maryland Quality Based Reimbursement Program and UM Capital's Infection Prevention Team ........................................3

    B.  Simmons Begins Working at UM Capital ...........................................6

    C.  Simmons' Performance and Conduct Concerns Begin During Her Probationary Period..........................................................7

    D.  Simmons' Performance and Conduct Issues Continue After Completing Her Probationary Period...........................................9

    E.  Simmons' Performance and Conduct Issues Continue After Receiving Her Requested Accommodations.....................................11

    F.  NHSN Reporting Dispute....................................................................14

    G.  UM Capital Terminates Simmons' Employment...............................22

VI.  SUMMARY OF ARGUMENT..................................................................24

VII.  STANDARD OF REVIEW .......................................................................26

VIII.  LEGAL ARGUMENT ...............................................................................27

    A.  The District Court Did Not Improperly Consider UM Capital's Evidence .............................................................................27

        1.  The District Court properly considered Simmons' claim that Lee stopped having 1:1 meetings with her in November 2018...................................................................29

2.  The District Court properly considered all evidence with respect to UM Capital's characterization of Simmons' performance issues and its legitimate non-discriminatory reason for terminating her employment ................................... 30

3.  The District Court properly considered Lee's and Connerney's testimony supported by documentary evidence with respect to Simmons' FCA/MFCA retaliation claims ................................................................. 32

B.  The District Court Did Not Err in Finding Simmons Failed to Create a Genuine Dispute on the Issue of Whether UM Capital's Non-Discriminatory Reason for Terminating Simmons Was Pretext Under the ADA ............................... 33

1.  UM Capital did not deviate from its Progressive Discipline Policy ...................................................... 35

2.  UM Capital's explanation for its decision to terminate Simmons' employment has remained consistent and is supported by undisputed evidence ........................................ 37

C.  The District Court Did Not Err in Determining Simmons Failed to Show She Engaged in Protected Activity Under the FCA/MFCA ................................................................. 39

IX.  CONCLUSION ................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Eberhardt v. Integrated Design & Constr, Inc.*,
  167 F.3d 861 (4th Cir. 1999) ...............................................................39, 40

*EEOC v. Manufacturers & Traders Tr. Co.*,
  429 F. Supp. 3d 89 (D. Md. 2019)...............................................................*passim*

*Gentry v. E. W. Partners Club Mgmt. Co. Inc.*,
  816 F.3d 228 (4th Cir. 2016) ...............................................................34

*Glynn v. Impact Science & Tech., Inc.*,
  807 F. Supp. 2d 391 (D. Md. 2011)...............................................................40

*Haywood v. Locke*,
  387 F. App'x 355 (4th Cir. 2010) ...............................................................35

*Hux v. City of Newport News*,
  451 F.3d 311 (4th Cir. 2006) ...............................................................28

*Jacobs v. N.C. Admin. Off. of the Cts.*,
  780 F.3d 562 (4th Cir. 2015) ...............................................................33

*Laird v. Redwood Trust LLC*,
  392 F.3d 661 (4th Cir. 2004) ...............................................................26

*Lestage v. Coloplast Corp.*,
  982 F.3d 37 (1st Cir. 2020)...............................................................44

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)...............................................................27, 39

*Mann v. Heckler & Koch Def., Inc.*,
  630 F.3d 338 (4th Cir. 2010) ...............................................................40, 43

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1987)...............................................................27

*Mid Atl. Telecom v. Long Distance Servs.*,
  18 F.3d 260 (4th Cir. 1994) ...............................................................26

iii

*Mitchell v. Toledo Hosp.*,
    964 F.2d 577 (6th Cir. 1992) ................................................................35

*Muth v. United States*,
    1 F.3d 246 (4th Cir. 1993) ...................................................................3

*SEC v. Chenery*,
    318 U.S. 80 (1943).............................................................................26

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502 (1993)...........................................................................33

*Swaso v. Onslow Cnty. Bd. of Educ.*,
    698 F. App'x 745 (4th Cir. 2017) ........................................................35

*Tekman v. Reliance Standard Life Ins. Co.*,
    55 F.4th 951 (4th Cir. 2022) ...............................................................32

*Theriot v. Parish of Jefferson*,
    185 F.3d 477 (5th Cir. 1999) ................................................................3

*United States ex rel. Dillard v. Fluor Corp.*,
    22-1450, 2023 WL 8618545 (4th Cir. Dec 13, 2023) ..........................43

*Vessells v. Kaydon Ring & Seal, Inc.*,
    Civil Action No. JKB-17-1516, 2018 WL 3122454 (D. Md. June
    26, 2018) ............................................................................................31

*Wadley v. Park at Landmark, LP*,
    264 F. App'x 279 (4th Cir. 2008) ...................................................27, 39

*Walton v. Harker*,
    33 F.4th 165 (4th Cir. 2022) ..........................................................43, 44

*Wright v. Sw. Airlines*,
    319 Fed. App'x 232 (4th Cir. 2009) ......................................................3

**Statutes**

42 U.S.C. §12112(a) ....................................................................................2

42 U.S.C. §12203(a) ....................................................................................2

Americans with Disabilities Act of 1990,
42 U.S.C. §§12101, *et seq* ...................................................................*passim*

False Claims Act, 31 U.S.C. §3730 ..............................................................*passim*

Md. Code Ann. Health Gen. §2-607 ..............................................................*passim*

**Other Authorities**

Centers for Medicare & Medicaid Services, "Maryland Total Cost of
Care Model" (Centers for Medicare & Medicaid Services) .................................4

## I.     JURISDICTIONAL STATEMENT

Defendant-Appellee Dimensions Health Corporation d/b/a UM Capital Region Health Inc. ("UM Capital" or "the Hospital" or "Appellee") accepts the jurisdictional statement set forth by Plaintiff-Appellant Kristin Simmons ("Simmons") and agrees the Court of Appeals has jurisdiction to hear this appeal.

## II.     STATEMENT REGARDING ORAL ARGUMENT

UM Capital does not believe oral argument would aid the Court of Appeal's disposition because the issues presented in this appeal are straightforward and not novel under established Fourth Circuit precedent.

## III.     STATEMENT OF ISSUES

Plaintiff-Appellant Simmons ("Simmons") has presented the following issues for review:

1.     Whether the district court erred by failing to consider all evidence in the record and construing the facts in favor of Appellee?

2.     Whether the district court erred in granting judgment as a matter of law with respect to Simmons' discrimination claim under the ADA (Count I) on the ground that there is not even an inference giving rise to a genuine dispute of material fact as to whether the purported legitimate nondiscriminatory reason Appellee gave for firing her was pretextual?

3.      Whether the district court erred in determining the evidence did not give rise to an inference that Simmons engaged in protected activity and if so, whether that inference presented a genuine dispute of material fact as to Counts III and IV?

## IV.    STATEMENT OF CASE

Simmons brought this action under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12112(a) and 12203(a), the Maryland False Claims Act ("MFCA"), Md. Code Ann. Health Gen. §2-607, and the False Claims Act ("FCA"), 31 U.S.C. §3730(h). Simmons alleged Appellee discriminated against her based on her disability, and retaliated against for engaging in protected activity under the ADA, MFCA and FCA.[1]

Simmons has fascia scapular humeral muscular dystrophy ("FSH"). Simmons was employed by UM Capital for roughly a year and a half between September 2017 and February 2019 as an Infection Prevention Practitioner. During Simmons' brief tenure with UM Capital, she reported to Yeo-Jin Lee, the then Director of the Infection Prevention team. From the beginning of her employment, Simmons struggled with reporting to Lee and made clear that she did not respect Lee's position, leadership, or ability to direct the Infection Prevention team. Simmons' conflicts with Lee did not stem from any purported disability or alleged protected

---

[1] Appellant does not challenge the district court's granting of summary judgment on her claim of ADA retaliation (Count II).

2

whistleblower activity, but rather from Simmons' inability to be effectively managed by someone whose management style she disliked.

Simmons was rude, sarcastic, and argumentative towards Lee and made every effort to undermine Lee's authority. The conflict between Lee and Simmons was palpable to the rest of the Infection Prevention team and took away from the collaborative environment UM Capital sought to create at a time when the Hospital was undergoing significant change and working to improve its delivery of healthcare services to Marylanders. Lee made every effort to improve her relationship with Simmons, but to no avail—Simmons simply did not respect or value Lee's leadership. Thus, after a year and a half of efforts to improve Simmons' attitude, UM Capital terminated Simmons' employment.

## V.  STATEMENT OF THE FACTS[2]

### A.  The Maryland Quality Based Reimbursement Program and UM Capital's Infection Prevention Team

In or around 2017, the University of Maryland Medical System ("UMMS") acquired and took over the operations of UM Capital from Dimensions Health

---

[2] To the extent Simmons alleges new facts and purports to have evidence, which was not presented to the district court, it is well established that the Court of Appeals "does not consider evidence that was not before the district court." *Wright v. Sw. Airlines*, 319 Fed. App'x 232, 234 n.2 (4th Cir. 2009); *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) ("As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered." (citations omitted)); *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491, n.26 (5th Cir. 1999) ("An appellate court

Corporation. (JA087). At the time, UM Capital was a medical facility located in Cheverly, Maryland.[3]

At the time UMMS acquired UM Capital, the then Chief Executive Officer of UMMS recruited Ingrid Connerney ("Connerney") to perform the role of Vice President and Chief Quality Officer for the Hospital to build out a Quality Control ("QC") team, which included Infection Prevention. (JA089, 095). Building out a QC and Infection Prevention team was crucial because prior to UMMS's acquisition, UM Capital had experienced quality and regulatory issues in prior years. Connerney was brought in to organize and turnaround the QC function. (*Id*.).

Maryland hospitals operate within a funding framework that relies on a population-based revenue model, overseen by the Maryland Health Services Cost Review Commission ("HSCRC"). [4] (JA122). Although the Centers for Medicare & Medicaid Services ("CMS") are responsible for ensuring that hospitals comply with

---

may not consider new evidence furnished for the first time on appeal and may not consider facts which were not before the district court at the time of the challenged ruling."). Accordingly, in determining whether the district court erred in granting UM Capital's Motion for Summary Judgment, the Court of Appeals should not consider any allegations Simmons made for the first time on appeal.

[3] The hospital has since relocated to Largo, Maryland.

[4] Centers for Medicare & Medicaid Services, "Maryland Total Cost of Care Model" (Centers for Medicare & Medicaid Services, n.d.), https://www.cms.gov/priorities/innovation/innovation-models/md-tccm#:~:text=The%20Maryland%20All%2DPayer%20Model%2C%20launched%20in%202014%2C%20established,revenue%20for%20the%20upcoming%20year. (last visited August 19, 2025).

the Medicare rules for reimbursement, hospitals in the State of Maryland are exempt from CMS' requirements for setting rates, and instead are managed by the HSCRC. (JA122-23). The Infection Prevention team is responsible for collecting and reporting out required data points to the Centers for Disease Control and Prevention's ("CDC"), National Healthcare Safety Network ("NHSN"). That information is shared with CMS[5] and HSCRC. (JA121-23). HSCRC then uses that data to set the rates hospitals can charge patients or insurance companies for care, to include Medicare and Medicaid. (*Id.*).

As part of Connerney's efforts to build the Infection Prevention team and improve quality, she hired a Director of Infection Prevention, Lee, and increased the staff of the Infection Prevention team. (JA089). Lee initially worked as a contractor for UM Capital. (JA145). After seven months working as a contractor, Connerney hired Lee as a regular employee to work in the Director role on a full-time basis in September 2017. (JA129, 145). Lee brought more than 20 years of experience in the infection prevention field to her role as the Director. (JA191-93).

In building out the QC teams (including Infection Prevention), Connerney was focused on ensuring the individual units were effectively working as a team,

---

[5] While the data the Infection Prevention team collects is reported to NHSN, CMS, and HSRC, due to Maryland's waiver, hospitals in the state are exempt from following federal CMS cost charge regulations and instead just follow the state specific HSCRC requirements. (JA122-23, 130-31).

collaborating, and regularly communicating, to ensure the Hospital met its regulatory obligations and quality metrics. (JA095-96). Connerney felt that unless her team worked together to get the work done, they would be unable to succeed in turning the department around. (JA096).

## B.      Simmons Begins Working at UM Capital

In September 2017, UM Capital hired Simmons as an Infection Control Practitioner (hereinafter "IP"). (JA090, 92). Simmons was subject to a 90-day probationary period. (JA091). As an IP, Simmons was responsible for system wide infection prevention and control programs. (JA195-203). This included partnering and working with leadership to identify, prioritize and address areas of improvement around infection prevention and support the reduction of healthcare acquired infections. (*Id*.). Simmons' primary responsibilities included identifying reportable conditions, communicating and coordinating with other units/departments throughout the Hospital, and reporting healthcare associated infections on a monthly basis to the NHSN database. (*Id*.).

At the time UM Capital hired Simmons, she had approximately two and half years of infection prevention experience. (*See* JA214-15). Lee was Simmons' direct supervisor. (JA148).

### C. Simmons' Performance and Conduct Concerns Begin During Her Probationary Period

From the beginning, Simmons struggled with reporting to Lee. Lee felt that Simmons was disengaged and did not work collaboratively with her, and Lee believed that Simmons' behavior interfered with Lee's ability to build a cohesive team. (JA155-56). Early on during Simmons' employment with UM Capital, Lee communicated to Simmons that she needed to improve on team communication and respect for others. (*See* JA217).

Shortly thereafter, in or around November 2017, Lee contacted Human Resources about her concerns with Simmons' behavior. (JA156). Specific examples of behavior that Lee brought to HR included, Simmons' refusal to make eye contact and unwillingness to speak or engage during team meetings, which included her looking at papers, not listening, no facial expressions and not responding when asked questions. (*See* JA219). Lee also highlighted several curt and short responses to emails that she felt were disrespectful and emails wherein Simmons just failed to respond. (*Id.*). Regarding Simmons' teamwork skills, Lee highlighted concerns with Simmons' work on a Hospital policy wherein she left another Infection Prevention team member out of the loop on the process and failed to communicate the status of the final version of the policy before sending it out. (*Id.*; *see also* JA159).

In November 2017, Lee met with Simmons and Human Resources Manager Laura Louis-Fils to speak about her concerns with Simmons' behavior and its impact

7

on the Infection Prevention team. (JA219). During the meeting, Lee and Louis-Fils highlighted the occasions wherein Lee felt that Simmons was rude to her, failed to respond to emails, and showed an overall lack of teamwork. (*Id.*). Louis-Fils also outlined the Hospital's communication expectations going forward, which included: communicating with courtesy and respect; being engaged during team meetings; demonstrating a willingness to work as a team; promoting open communication; and communicating about the status of projects and assignments in a timely manner. (*Id.*).

As a result of her concerns with Simmons' performance, in December 2017, Lee made the decision to extend Simmons' 90-day probationary period by an additional 30 days. (JA162, 91). Lee and Louis-Fils communicated the decision to Simmons on or about December 15, 2017. (JA221). In deciding to extend Simmons' probationary period, Lee emphasized that Simmons needed to improve her performance in the following areas: communicating with Lee; engaging in team meetings; promoting open communication to foster partnership and collaboration within the team and other departments; and communicating the status of projects and assignments in a timely manner. (*Id.*).

On January 19, 2018, Simmons completed her extended probationary period, and her employment continued with the Hospital. (JA225).

8

**D. Simmons' Performance and Conduct Issues Continue After Completing Her Probationary Period**

Shortly after completing her probationary period, Simmons reverted back to her prior problematic behavior with respect to communication and lack of teamwork or collaboration with Lee. (JA092-93). In early February 2018, Simmons contacted Louis-Fils regarding the ongoing communication issues with Lee. (*See* JA227, 229). Simmons complained that Lee had berated her to the point of tears during a private one-on-one meeting. (*Id.*). Louis-Fils asked if Simmons had attempted to talk with Lee about the recent exchanges, noting it was important to meet with a manager and be able to express her concerns. (*Id.*). Simmons said that she was uncomfortable being alone with Lee, stating that she did not believe Lee had "enough emotional intelligence to adapt her approach." (*Id.*).

Louis-Fils informed Connerney and Lee of Simmons' concerns. Connerney then set up a meeting with Lee and Simmons, together, to discuss the ongoing communication struggles. (JA227). Connerney felt it was important to all meet together so there was no misunderstanding regarding her expectation that teamwork and collaboration be prioritized and discuss how Simmons and Lee could improve in those areas. (JA096). Connerney documented the conversation with contemporaneous notes. (JA134).

During the meeting, Connerney asked Simmons to provide her thoughts on communication with Lee and to give an update on how things were going between

9

the two. (JA097, 227). In sum, Simmons felt that Lee treated her as if she was "infantile," and did not trust her to do her job. (JA227, 98).

Understanding that Simmons may not have been part of Connerney's initial conversation with her staff where she emphasized the need for teamwork, collaboration and communication, Connerney explained to Simmons that her perception of Lee's motivations was incorrect. Lee simply was ensuring that the work was completed because Connerney was holding Lee accountable for the work on her team. (JA227, 98).

It was Connerney's expectation that her directors check and double check things were getting done correctly and establish a standardized process. (JA227). While Connerney noted that she understood Simmons had previously worked without a director prior to coming to UM Capital, it was Connerney's expectation that Lee lead and direct the department. (*Id*.). Connerney noted that she herself had been hired to help turn things around for the Hospital in terms of QC and compliance, as the Hospital's past practice of staff working autonomously with little communication and collaboration had led to the organization not properly functioning. (JA227, 98).

Connerney noted that, as a next step, she would check-in with Lee and Simmons within the next few weeks to see whether communication had improved. (JA227).

10

### E.    Simmons' Performance and Conduct Issues Continue After Receiving Her Requested Accommodations

On or about March 2, 2018, Connerney again met with Simmons and Lee to follow up on the prior discussion about communication and teamwork, which Connerney contemporaneously documented with handwritten notes. (JA233, 135). During the meeting, Lee said Simmons still was not meeting her expectations and felt Simmons needed to be more open and active during staff meetings. (JA233). Lee noted that Simmons was not "nodding, just staring, not talking. I don't have the feeling that we are connecting." (*Id.*). Simmons responded that she had a condition which "made smiling hard." (*Id.*).

Simmons never provided to UM Capital, Lee or Connerney documentation from a healthcare provider that supported her contention that she had a medical condition that impacted her ability to make facial expressions or smile. To the contrary, Simmons admits that she is physically able to smile. (JA242-43). Regardless, in response, Connerney encouraged Simmons to use words (*i.e.*, "I hear you" or "I understand") or other nonverbal gesture (*i.e.*, nodding) to show engagement in the conversation. (JA233).

Shortly after the March 2, 2018, meeting Simmons filed a complaint with the Hospital's corporate compliance office alleging that Lee and Connerney forced her to disclose her medical condition. (*Id.*). Simmons' allegations were investigated and found to be unsubstantiated. (*Id.*). Simmons was also informed that failure to

11

communicate with her manager could result in a violation of UM Capital policies, to include the Employee Conduct and Progressive Disciplinary policy and the Professional Behavior policy. (JA496).

Thereafter, in April of 2018, Simmons submitted several requests for reasonable accommodations.[6] (JA260-61, 273-74). Simmons' request sought, *inter alia*, an exemption from UM Capital's Employee Conduct and Progressive Disciplinary Action policy and the Professional Behavior policy as they applied to any facial expressions and non-verbal responses or lack thereof. (JA273-74). In support of her request, Simmons included the following representations as to the basis behind her request:

> Non-verbal feedback requested during interactions with manager. I am not always able to produce the kinds of facial expressions she desires and the stress of not being able to do so is exacerbating other physical manifestations of my condition. Her penchant for changing her mind/expectations with no warning or documentation and delivering overly harsh criticism when we are alone is also contributing to undue stress.

> My condition adversely affects the muscles in my face, making some facial expressions difficult. The stress of not meeting social expectations and coping with my manager's managerial style is exacerbating physical symptoms of pain and fatigue.

> Assurances that my facial expressions will not negatively impact any performance evaluations. As all excessively stressful interactions have occurred and continue to occur when we are alone, I request that either we do not have unsupervised interactions or that all interactions be

---

[6] Simmons initially sought a manual sit-to-stand desk, and then later requested an electric version of the same. (JA260-61). Both requests were granted. (JA261).

documented in written form. Both accommodations will help to allay anxiety and stress and hopefully decrease physical symptoms.

(*Id*.).

Simmons' request also included a note from her medical provider stating that Simmons was seeking "Reduced stress associated with interactions with her manager. Either interactions need to be supervised by a third party to alleviate stress or interactions should be followed up with a written account of what was discussed and any new expectations to alleviate anxiety over misinterpretation." (*Id*.). The submitted doctor's note makes no mention of Simmons' facial expressions or inability to smile. (*Id*.).

On May 3, 2018, Deb Lacquement, Assistant Director Employee Health and Wellness Programs, responded to Simmons' Requests for Reasonable Accommodations. (JA283). In response, Lacquement notified Simmons that her request seeking to be exempt from certain conduct and disciplinary policies did not fall under an ADA accommodation request. (*Id*.).

On June 6, 2018, Simmons met with Veronica Ford, Vice President of Human Resources and Regina Bryan, Employee and Labor Relations Advisor, to discuss her requested accommodations. (JA285). During the meeting, Simmons again asked that Lee put all expectations and goals in writing and asked that meeting minutes be provided for any department meetings. (*Id*.). Ford and Bryan then met with Lee to discuss the accommodation requests, and the Hospital agreed to provide Simmons

13

with meeting minutes and written recaps of all 1:1 discussions. (*Id*.). The Hospital also approved HR's presence in 1:1 meetings with Lee and Simmons going forward. (*Id*.). By August 2018, HR was present in all 1:1 meetings between Lee and Simmons. (JA262).

### F.    NHSN Reporting Dispute

In late 2018, Hospital leadership began looking at how to obtain additional Intensive Care Unit ("ICU") Beds due to a frequent shortage. (JA112, 173-74). One of the options discussed was designating four Post-Anesthesia Care Unit ("PACU") beds as full time ICU beds. (JA165, 174). At the time there were several PACU beds the Hospital would occasionally use as overflow beds to temporarily "board" ICU patients.  (JA183-84). Four of those PACU beds were in a closed off area, behind a door, and Hospital leadership wanted to explore the possibility of converting those four private PACU beds into permanent ICU beds. (JA185).

Because NHSN has different rules for how hospitals should map, *i.e.*, code, the designated units within their facilities, a designation change from PACU to permanent ICU would impact how the Hospital's infection data for those beds should be surveyed, collected, and reported. (JA113, 179-80). For example, due to the patient population in PACU beds, *i.e.*, temporary post-operation and post-anesthesia patients, there is no requirement to collect or report certain infection data.

14

(JA167, 184). In contrast, the Infection Prevention team regularly collects and reports infection data for ICU beds to NHSN. (JA176)

For the Hospital to remap the PACU beds as permanent ICU beds and start including them in infection reports, those converted beds would need to meet NHSN's "80 percent rule" or the "80/20 rule" which essentially requires that the beds need to be occupied by ICU patient's 80 percent of the time to be designated as such on a permanent basis (for reporting purposes). (JA180). To determine whether the beds met the "80 percent rule," the Infection Prevention team needed to collect data for a minimum of one month to understand the patient utilization of the beds and determine whether ICU patients were actually utilizing the PACU beds 80 percent of the time. (JA114).

The Infection Prevention team was tasked with determining whether the four PACU beds could be permanently designated as ICU beds based on their regular usage by meeting the "80 percent rule," and if so, how the Infection Prevention team could incorporate any new ICU beds into its surveillance and collecting of infection data for reporting purposes. (JA165, 174). The Hospital's plan was to collect data for the four overflow PACU beds separately from regular ICU beds, and once the population data could be verified (*i.e.*, meaning if it met the utilization requirement), develop a plan for reporting the additional beds to NHSN.  (JA113, 174).

15

Simmons was already assigned to support the ICU and was therefore familiar with the data collection requirements for such beds. Lee asked Simmons to collect data on the utilization of the four overflow PACU beds, consistent with the collection requirements for ICU beds. (JA113, 166). Lee asked that the PACU numbers be tallied separate from the ICU numbers to ensure the proper validation process was followed—this instruction was discussed during the December 21, 2018, team huddle, to which Lee followed up in writing. (JA306-07). Simmons was asked to start collecting the data beginning on January 1, 2019. (JA309-12).

Shortly after the December Infection Prevention team huddle, Simmons reached out to NHSN, not about collecting data, but with a hypothetical on how to "capture patient days and device days" for "four additional ICU beds." (JA314-15). Specifically, Simmons presented the following hypothetical:

> I have a question about potentially combining areas containing the same patient population that are in physically separate areas.
>
> A hypothetical situation:
>
> - A facility needs more ICU beds but cannot construct a new unit
>
> - Facility finds beds in their PACU area (normally classified as outpatient) that could serve as ICU beds
>
> - Facility then designates four PACU beds as permanent ICU beds, serving the same population as the existing, physically separate ICU
>
> In this case, how would the facility capture the patient days and device days from those four additional ICU beds? Do they need to be mapped as completely separate virtual location, as they are physically separated

16

from the main ICU? Can their numbers simply be added on the main ICU's numbers?

Further complicating this scenario, what if the four beds in question are not *always* going to be ICU beds and might house a different type of patient on occasion? Does the 80/20 rule apply in this case?

I guess what I'm looking for is the best (and NHSN-approved) way to capture the new ICU beds' patient and device days.

(*Id.*).

This outreach was done prior to Simmons collecting any patient data or otherwise validating the patient population as she was directed to do, and further before UM Capital had actually made the decision on whether to convert the four overflow PACU beds to permanent ICU beds. (*Id.*). Shortly after Simmons reached out to NHSN with her hypothetical, but prior to receiving a response, on or about December 27, 2018, Simmons began to argue with Lee about the instruction to collect data. (JA309-12, 314-15). Specifically, Simmons argued with the timing and feasibility of the assignment stating:

> PACU device days: huddle on 12/21 was the first I heard of this new ***patient days collection requirement***. It should not normally be an issue, but with the upheaval in CCC with Maureen's departure, I can't predict that this will go smoothly. I have been trying unsuccessfully to get a meeting with Toni since I was abruptly assigned this project last Friday. I'm hoping to meet with Francie today to get a feel for device days collection process in CCC and how the PACU is going to be staffed/supervised.

(JA310 (emphasis added)).

17

In response, Lee reiterated that Simmons was merely to collect data (*i.e.,* device days), and that she did not see the assignment as such a heavy lift, stating:

> [t]his has been discussed several times during our team meeting and since you've been supporting ICUs all along, I don't think this is an "abrupt" assignment for you. As we discussed, if CCU team has been collecting device days without major issues, this should not be too difficult. Let me know if you encounter any issues after speaking with Francie."

(*Id.*)

Thereafter, on December 28, 2018, at 10:59 a.m., NHSN responded to Simmons' inquiry with the following:

> Thanks for your question. For your hypothetical situation, I would only add a virtual location for those designated ICU beds if they were to meet the 80/20 rule consistently every month. They would report data separate in this unit apart from the other ICU units. If this area does not meet the 80/20 rule for ICU beds, it will have to be classified as a different location that meets an NHSN definition.

(JA314).

Importantly, Simmons did not notify Lee of her NHSN outreach and the response, but instead forwarded the response to her coworkers (excluding Lee) stating:

> No, you can't add the PACU-ICU beds into the main ICU denominators to pad the numbers. Creating a separate virtual location would just be setting us up for failure, I think, because with the tiny denominators it will generate, any infections (and we know there will be infections – see the CAUTI from October) will look astronomically bad.

(*Id.*).

18

Simmons did not raise concerns about defrauding the government or otherwise submitting false or inaccurate data to NHSN, because she was never directed to do so nor at risk of doing so based on the task given by Lee. (JA309-12, 314-15). Instead, at 4:03 p.m. on December 28, 2018, Simmons emailed Lee to once again argue about the direction to collect data:

> Related to this, I'm not sure it's acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, as you instructed. I would think that, being a separate physical location, to capture the PACU-ICU beds, a virtual location would have to be created. The problem with that is that if the beds are not used by ICU consistently enough to meet the 80/20 rule (and from what Francie tells me, they may not – they've had PCRU and med/surg patients in them recently), we would have to call it mixed acuity which isn't reportable to CMS anyway. Even if we could call it its own 4-bed ICU, I think we might be shooting ourselves in the foot a little because any infection (like the CAUTI in October) would completely tank our rates, given such a minuscule denominator. Please let me know if there is something I'm missing here, or if there are major changes coming to the bed-assignment process that haven't been communicated to us yet.

(JA311). Again, Simmons did not disclose that she had reached out to NHSN, or otherwise raise concerns about defrauding the government or submitting false or fraudulent numbers to NHSN.[7] (*Id.*).

In response to Simmons' email, Lee again reiterated that her instruction was merely to ***collect data*** to verify the patient population stating: "PACU ICU beds:

---

[7] Indeed, her voiced concern did not relate to any improper benefit the Hospital might incur, but rather, the *harm* to the hospital's infection statistics.

19

Because of that uncertainty of the bed utilization, we need to start collect[ing] data to determine further about this." (JA309).

On January 10, 2019, during one of the Infection Prevention team huddles, Lee again discussed the issue of a potential PACU-to-ICU bed transition, stating that she intended to reach out to NHSN if and when the data regarding bed usage was validated. (JA295). Having ignored Lee's direction to collect data regarding the PACU beds, corresponded with NHSN, and shared that data with her peers, Simmons waited until this group meeting to tell Lee that she had already contacted NHSN. (*Id.*). Lee felt that Simmons was refusing to complete a task at her direction, and was "blindsided." (JA295).

During the same time period that Simmons was refusing to collect data for the PACU beds, Connerney was setting up meetings with individual IPs to discuss teamwork and collaboration on the Infection Prevention team.  (JA103-05, 317-19). Connerney, met with Simmons, Kisha Gates and Cindy Rosenberger, all IPs who reported to Lee. (JA317-19).

Connerney met with Rosenberger, on or about January 9, 2019.  (JA318). During the meeting Rosenberger stated that the dynamics on the team were "weird." (*Id.*) Rosenberg also shared with Connerney that Simmons had been rude to Lee. Rosenberg report that Simmons said to Lee "this is a stupid idea." (*Id.*). As a way to improve the team dynamics, Rosenberger suggested the team be more collaborative,

20

build trust, and more clearly define the team's roles and responsibilities. Rosenberger also commented that Lee and Simmons' relationship needed to improve. (*Id*.).

Connerney met with Gates on or about January 11, 2019. (*Id*.). Gates also highlighted the strained relationship between Simmons and Lee. (*Id*.). By way of example, Gates highlighted the interaction that had occurred during the January 10, 2019, Infection Prevention huddle. (*Id*.). Gates reported that Simmons did not tell Lee that she had contacted NHSN until five minutes into a conversation, which Gates found problematic. (*Id*.). Gates noted that she would have shared the response from NHSN with her supervisor as soon as she received it. (*Id*.). Gates noted that she did not know how to make the team dynamics better but felt a team building exercise was needed. Gates also felt that the team should communicate verbally and with a follow up e-mail. (JA319).

Connerney met with Simmons on or about January 14, 2019. (*Id*.). Simmons reported that she preferred more flexibility than Lee provided, believed that Lee did not trust her, and felt irritated by the team huddles. (*Id*.). Simmons' only suggestion on how to improve team dynamics was to end the Infection Prevention huddles and instead communicate only via email. (*Id*.).

Simmons' response and interest in creating further distance between herself and the Infection Prevention team was concerning to Connerney. (JA109-10).

21

Simmons' response showed her unwillingness or inability to work collaboratively. (*Id.*). Also concerning was Simmons' desire to eliminate team huddles because it conflicted with Connerney's goal of ensuring patient safety. (*Id.*). Connerney believed that the huddles were important for timely communication of safety concerns. (*Id.*).

### G.     UM Capital Terminates Simmons' Employment

Shortly after Connerney's individual meetings with all of the IPs on the Infection Prevention Team, it became clear that despite Lee's and Connerney's efforts, Simmons' collaboration and attitude towards Lee had not improved. (JA152, 109-10).

As a result, in early 2019, Lee and Connerney, in consultation with Ford in HR, made the decision to terminate Simmons' employment. (JA150-52, 117-18). Connerney and Lee each drafted a memorandum to Human Resources, outlining the basis for their recommendation to terminate Simmons, providing a timeline of the behavior and conduct issues Simmons had exhibited during the course of her employment. (JA321-23, 325-29).

Lee felt that she had given Simmons more than a year to improve her behavior, but her lack of cooperation, not working as a team, and disrespectful behavior towards Lee were no longer tolerable. (JA152-60). Lee outlined multiple incidents in a chronological timeline that had occurred since the commencement of Simmons'

employment at UM Capital through January 2019 to show the relationship was no longer tenable. (JA325-29). Lee summarized her reason for recommending Simmons' termination as follows:

> Despite the effort by HR and management during the past year, Kristin's disrespectful and unprofessional behavior towards me continued and there is no sign of sustained improvement in her behavior. Most of the time, she does not show interest in working with me and gets easily irritated and sarcastic when she doesn't like my plans and ideas. I believe that this kind of behavior stems from Kristin's personal biases and not accepting my leadership. This undermines my ability to lead the department effectively.
>
> Kristin does not work as a team player and her negative attitude greatly affects the entire department functioning as a cohesive and effective time.

(JA329).

Connerney agreed that the working relationship with Simmons was no longer tenable. (JA126). Connerney believed that Simmons was simply not willing to work collaboratively and was disrespectful. (JA126-27). Connerney outlined a similar chronological timeline of the problematic communication and behavior Simmons had exhibited during her tenure at UM Capital. (JA321-23). Connerney's assessment of Simmons' behavior was as follows:

> Kristin's issue and non-agreement with Yeo-Jin's leadership is impacting the functioning of the whole infection team and Kristin is withholding timely communication with Yeo-Jin. I am critically concerned about Kristin's objectivity and honesty, as she for example tells me that managers have concerns with Yeo-Jin, which the managers did not collaborate [sic] when I approached them. She tells me that she

23

rounds on units alone versus with Kisha, which the other 2 coordinators did not report.

We have been clear about expectations and communication, team work and collaboration in the last 12 months, and when asked by me on Jan 9 and 11, 2019, both Kisha and Cindy are willing and interested in improving team work and trust, whereas Kristin had no suggestion other than to terminate infection team huddle and communicate by email with Yeo-Jin.

(JA322-23). Thus, on or about February 19, 2019, Lee and Ford met with Simmons and communicated the Hospital's decision to terminate her employment. (JA270).

## VI.    SUMMARY OF ARGUMENT

Regarding her disability discrimination and FCA/MFCA retaliation claims, Simmons argues that the lower court erred by failing to (i) address evidence of discrimination leading up to Simmons' termination; (ii) give due weight to Simmons' testimony, as the non-moving party, over Appellee's testimony, which it contends was "self-serving" and contradicted by unspecified evidence, and (iii) give weight to the facts which Simmons contended showed that Appellee violated their progressive discipline policy in deciding to terminate Simmons' employment.

A review of the record shows that the district court correctly considered the evidence and found that Simmons had not met her burden of creating a genuine dispute of material fact on the issue of pretext. First, contrary to Simmons' contention, the district court did consider Simmons' argument that there was discrimination "leading up to [her] termination"—*i.e.,* her claim that Lee's

24

perception of Simmons' rudeness and insubordination was based on Simmons' disability—and determined that there was no evidence to support such claim. (JA634-35). Next, the district court considered Simmons' testimony but correctly determined that her uncorroborated self-serving statements were not sufficient to create a genuine dispute that UM Capital did not truly believe that Simmons' conduct was disrespectful and insubordinate. Further, there is ample evidence in the record to show that Simmons' argument that UM Capital's reason for terminating her employment was a *post hoc* justification is baseless. Finally, the record shows that Simmons failed to point to any material in the record from which a reasonable juror could infer that UM Capital applied its progressive discipline policy in a discriminatory manner. Regardless, the plain text of the policy allows the Hospital to skip steps in the process, and Simmons' argument ignores evidence in the record of the months long effort by Lee to provide feedback to Simmons regarding her unacceptable conduct. (JA619-22). The district court correctly considered all evidence and determined that UM Capital proffered a legitimate, non-discriminatory reason for terminating Simmons' employment, and Simmons failed to put forth evidence that would allow a factfinder to find pretext.

Regarding Simmons' FCA/MFCA retaliation claims, Simmons argues that the district court erred in finding that she did not engage in protected activity because she had no objectively reasonable belief that UM Capital would soon violate the

25

FCA or the MFCA. Not only does Simmons disregard her burden of proof, in arguing that the district court erroneously granted UM Capital summary judgment she ignores the multiple grounds upon which the court based its decision. Simmons argues that the district court erroneously found that Simmons' self-serving testimony was not sufficient to survive summary judgment. (JA639-40). On appeal, Simmons continues to rely on her self-serving testimony. (Appellant Br. 53-54). Simmons argues the district court improperly determined that UM Capital would prevail if the action was tried on its merits. The district court made no such determination. Instead, the district court relied upon Lee's testimony, which is corroborated by the evidence in the record. The undisputed evidence in the record shows that Simmons did not have a reasonable belief that UM Capital could soon violate the FCA or the MFCA. It thus was proper for the district court to find in favor of UM Capital as a matter of law.

## VII.   STANDARD OF REVIEW

The Court of Appeals reviews the grant of summary judgment *de novo*, employing the same standards applied by the district court. *See Mid Atl. Telecom v. Long Distance Servs.*, 18 F.3d 260, 262 (4th Cir. 1994). The Court of Appeals may affirm a district court's decision on summary judgment for the same or different reasons. *Laird v. Redwood Trust LLC*, 392 F.3d 661, 666 (4th Cir. 2004) (citing *SEC v. Chenery*, 318 U.S. 80, 88 (1943)).

26

## VIII.  LEGAL ARGUMENT

### A.    The District Court Did Not Improperly Consider UM Capital's Evidence

Simmons contends that the district court improperly construed the facts in the light most favorable to UM Capital.  Simmons' argument is wrong and misstates the standard the district court was required to utilize at summary judgment. Although it is true that the lower court must view all the facts, including reasonable inferences, in the light most favorable to the nonmovant party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1987), self-serving, unsubstantiated statements and personal beliefs, *without more* are not sufficient to overcome summary judgment. *See e.g., Wadley v. Park at Landmark, LP*, 264 F. App'x 279, 281 (4th Cir. 2008) (finding that a plaintiff's "own self-serving, unsubstantiated statements in opposition to [the defendant's] evidence in this regard is insufficient to stave off summary judgment."). Speculative testimony is likewise insufficient to create a genuine issue of material fact. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

Regarding her disability discrimination and FCA/MFCA retaliation claims, Simmons argues the district court: (1) disregarded the fact that her supervisor Lee stopped holding one-on-one meetings with her in November 2018, (2) improperly accepted UM Capital's characterization of Simmons' performance issues, and (3) with respect to her FCA/MFCA retaliation claim, accepted Lee's and Connerney's

27

testimony regarding Lee's instruction to collect data for certain PACU beds, which Simmons contends is "unsupported."

None of these arguments hold water as Simmons now seeks to undermine UM Capital's legitimate, non-discriminatory justification for her termination from employment by focusing on wholly irrelevant matters and highlighting non-existent discrepancies, which are not material, nor do they create a genuine dispute. *See Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006) (explaining that a plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity); *EEOC v. Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d 89, 121 (D. Md. 2019) (citations omitted).

To reverse the district court's granting of summary judgment, the Court of Appeals would have to engage in conjecture to reach the conclusion that Lee and Connerney were not truthful regarding the reason that Simmons was terminated. Simmons' self-serving assertions are not sufficient because it is well-settled that Simmons needed corroborating evidence. On the other hand, UM Capital relied on witness testimony *and* corroborating documentary evidence. It was not an issue of weighing the evidence because that would have been improper. It was the absence of material in the record to support an inference of discrimination.

28

### 1. The District Court properly considered Simmons' claim that Lee stopped having 1:1 meetings with her in November 2018

Simmons claims that the district court improperly failed to consider Lee's failure to schedule one-on-one meetings after November 2018 as an adverse employment action. (Appellant Br. 40-41). It appears that Simmons is contending that if Lee had continued to schedule one-on-one meetings, her conduct would have improved and she would not have been terminated. Such improvement is based entirely on conjecture. Simmons points to no evidence in the record that shows one-on-one meetings were effective in improving performance or behavior. Even if Simmons had satisfied her burden of proof, there is no evidence in the record that links her termination or alleged lack of one-on-one meetings to a disability.

Moreover, contrary to Simmons' contention, the record shows that the district court construed as true that Lee stopped scheduling one-on-one meetings with her in November 2018; four months before her termination. (JA623, 631). To the extent that Simmons claims that Lee's failure to schedule one-on-one meetings provides evidence of pretext, the Court correctly cited *Manufacturers & Traders Tr. Co.* for the proposition that an employee cannot undermine an employer's legitimate, non-discriminatory reason for an employment action by "focusing on minor discrepancies," or "raising points that are wholly irrelevant." (JA632-33). It is clear from the district court's decision that the failure to schedule one-on-one meetings

29

was viewed as irrelevant to the issue of whether UM Capital's reason for terminating Simmons was pretextual and actually because of a disability.

Even if the lack of one-on-one meetings between Lee and Simmons were appropriately considered an adverse action for the purpose of Simmons' ADA discrimination claim, it still fails due to a complete lack of evidence in the record tying her medical condition and the end of the meetings in November 2018. In fact, Simmons testified that Lee stopped meeting with her after she requested an accommodation. (JA430-31). In essence, Simmons testified that she believed Lee was retaliating against her for requesting an accommodation by stopping one-on-one meetings. However, Simmons has not challenged the district court's finding in favor of UM Capital on her ADA retaliation claim. (Appellant Br. 11 n.1).

**2.    The District Court properly considered all evidence with respect to UM Capital's characterization of Simmons' performance issues and its legitimate non-discriminatory reason for terminating her employment**

Simmons' claim that the district court improperly accepted UM Capital's characterization of her performance issues also fails. Simmons asserts that it was erroneous for the district court to believe Lee and Connerney—her first- and second-line supervisor—who were the decision-makers. The case law is explicitly clear, that only the perception of the decision maker is relevant to the question of whether they acted with discriminatory animus. *See Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 121. As such, Simmons' personal and subjective belief about whether

30

her behavior was in fact rude, disrespectful, or otherwise demonstrated an unwillingness to effectively collaborate with her supervisor—without more—is not material. *See, e.g.*, *Vessells v. Kaydon Ring & Seal, Inc.*, Civil Action No. JKB-17-1516, 2018 WL 3122454, at \*7 (D. Md. June 26, 2018), *aff'd sub nom. Vessells v. Kaydon Ring & Seal, Inc.*, 749 F. App'x 211 (4th Cir. 2019).

Simmons' belief that no one else at UM Capital complained about her conduct is likewise immaterial and not supported by the record. In fact, the evidence in the record shows that Rosenberger reported to Connerney that she had observed Simmons being rude to Lee. (JA318). Simmons failed to create a genuine dispute of material fact regarding Lee's and Connerney's belief that Simmons' behavior and conduct towards them was rude and insubordinate, and that they had tried to address the behavior from the start of Simmons' employment. (JA219, 221, 227, 287-90, 297, 317-19, 321-23, 325-29). Their dissatisfaction with Simmons' behavior is corroborated extensively by the evidence in the record.

Simmons' claim that the district court erroneously disregarded the timing of UM Capital's justification for her termination decision is wrong. Simmons cites to no material in the record to show that Lee and Connerney were not concerned about her behavior prior to late 2018 or early 2019. In fact, the evidence in the record shows that Simmons was made aware that her behavior was unacceptable during her probationary period. The evidence of Lee's and Connerney's concerns with

31

Simmons' conduct date back to the start of Simmons' employment. (JA219, 221, 287-90, 297). Indeed, the district court explicitly highlighted that the record was filled with "fraught communications and interactions between [ ] Lee and Plaintiff that management viewed as disrespect and insubordination." (JA635).

Simmons has simply failed to put forth any actual evidence undermining the district court's determination that Simmons failed to create a genuine dispute on the issue of whether "but-for" a disability UM Capital would not have terminated her employment.

### 3.    The District Court properly considered Lee's and Connerney's testimony supported by documentary evidence with respect to Simmons' FCA/MFCA retaliation claims

Simmons' arguments that the district court improperly weighed evidence in support of her FCA/MFCA claims also fail. The district court is not to weigh evidence. *See Tekman v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 959 (4th Cir. 2022) (explaining that generally in the context of summary judgment a court may not weigh evidence or engage in credibility findings). Here, the record evidence is clear and undisputed—at no point did Lee instruct Simmons to do anything except to collect data. That Lee discussed hypothetical possibilities about how to report that data or how to utilize hospital beds depending on the data does not change this simple fact. The district court accepting Lee's and Connerney's testimony on these points was not a credibility determination or a weighing of the evidence—there was no

evidence to refute the evidence in the record. Their testimony was corroborated with documentary evidence, which again, the district court highlighted in its finding that Simmons did not engage in protected activity under the FCA/MFCA. (JA639-41).

**B.    The District Court Did Not Err in Finding Simmons Failed to Create a Genuine Dispute on the Issue of Whether UM Capital's Non-Discriminatory Reason for Terminating Simmons Was Pretext Under the ADA**

Simmons' ADA discrimination claim is governed by the *McDonnell Douglas* burden-shifting evidentiary framework because Simmons has produced no direct evidence of discrimination. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572, 577 (4th Cir. 2015) (discussing the ADA evidentiary burden). Under that framework, Simmons first carries the burden of proof and persuasion to establish *a prima facie* case. *Id.* at 571. If successful, the burden of production shifts to the employer to proffer a legitimate non-discriminatory reason for the adverse action. *Id.* at 575. In cases where the employer has made this proffer, Simmons bears the ultimate burden of persuasion to show that the proffered legitimate non-discriminatory reason proffered is mere pretext. *Id.* Simmons must prove "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515-16 (1993).

Courts in this Circuit have recognized that the existence of a *prima facie* case is presumed once an employer proffers a legitimate non-discriminatory reason.[8] *Mfs. & Traders Trust Co.*, 429 F. Supp. at 120. Instead, the district court may focus on the ultimate question of whether Simmons has created a genuine issue of material fact about the reason being a pretext for intentional discrimination. *Id.* To demonstrate discrimination under the ADA, Simmons must meet the "but for" standard of causation. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235-36 (4th Cir. 2016) ("The only remaining question is whether the ADA's text calls for a 'but-for' causation standard. We hold that it does.")

The district court correctly determined that Simmons could not meet this high burden. UM Capital clearly articulated, with supporting evidence, that Simmons' employment ended because of her rude and disrespectful behavior that on occasion amounted to insubordination and negatively impacted the collaborative team environment. The conflict between Simmons and Lee is well documented throughout the entirety of Simmons' employment. (JA219, 221, 287-90, 297). This behavior was not only unacceptable but disruptive to the overall team environment and did not comport with Connerney's efforts to promote teamwork and

---

[8] Solely for the purposes of this appeal, UM Capital will assume that Simmons is a "qualified individual" with a disability under the ADA, however nothing precludes UM Capital from raising this as a defense should the Court of Appeals remand this claim for further proceedings.

34

collaboration in an effort to ensure UM Capital was complying with its regulatory and safety requirements. (JA317-19, 321-23, 325-29).

Simmons contends that there is a genuine dispute regarding whether her conduct warranted termination, but she failed to point to evidence in the record from which a reasonable juror could have inferred that Lee's and Connerney's opinions of her conduct were untrue and instead pretext for illegal discrimination based on a disability. Importantly, and not addressed on Simmons' appeal, she failed to demonstrate that she was treated differently than similarly situated individuals outside of her protected class. *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748-49 (4th Cir. 2017); *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Instead, in an effort to obfuscate this glaring omission, Simmons tries to argue that she has demonstrated pretext by showing that UM Capital deviated from its progressive discipline policy and had shifting explanations that were contradicted by evidence. (Appellant's Br. 45). As shown below, Simmons still has not satisfied her burden of proving pretext.

### 1. UM Capital did not deviate from its Progressive Discipline Policy

Despite Simmons' contention, the record is clear that UM Capital was under no obligation to issue Simmons a lower level of discipline prior to termination based on any Hospital policy. To claim that Simmons was terminated "without warning"

35

is also comical seeing as Simmons herself was aware of the fraught relationship with her supervisors that continued for the entirety of her employment as she complained to Human Resources (JA621-23). Moreover, the policy states that UM Capital has the right to immediately terminate an employee when warranted. (JA464). The policy also notes that the steps for progressive discipline are permissive, not mandatory. Specifically, the policy states that the Hospital "reserves the right to advance or omit steps of the process when warranted" and "should discuss these situations . . . with a Human Resources manager." (JA466).

While Simmons was not put through every step of the progressive discipline policy, the evidence in the record shows that she was given ample opportunity to correct her behavior. Lee and Connerney attempted to address Simmons' behavioral issues informally throughout her employment. Lee and Connerney worked with Human Resources and provided feedback to Simmons regarding her unacceptable conduct throughout her employment. (JA219, 221, 227, 287-90, 297, 317-19, 321-23, 325-29). That Simmons failed to improve or take that informal guidance and coaching seriously, was to her detriment and UM Capital was not required to issue more formal levels of lesser discipline than a termination when Simmons showed no intention of changing her behavior and becoming more collaborative, or otherwise acknowledging that she understood her behavior towards Lee was unacceptable.

36

### 2. UM Capital's explanation for its decision to terminate Simmons' employment has remained consistent and is supported by undisputed evidence

Simmons' argument that UM Capital provided a "shifting explanation" for its decision to terminate her employment likewise fails. The record fails to show that UM Capital has had a different explanation for Simmons' termination ever. UM Capital's position statement submitted to the Equal Employment Opportunity Commission (EEOC) and its motions have all consistently held that Simmons' rude, disrespectful, and insubordinate behavior were the reason for her termination. (JA589-97). The fact that one example of Simmons' rude behavior was her intentional withholding of information pertaining to her outreach to NHSN and a purposeful effort to try and humiliate Lee in front of the entire team, is but one of many examples of Simmons' disrespectful behavior and clear dislike of her supervisor.

Contrary to Simmons' contention, UM Capital has had a clear and consistent justification for terminating Simmons' employment. Again, prior to proceeding with Simmons' termination, Lee and Connerney consulted with Human Resources about Simmons' repeated and demonstrated inability to cooperate with her supervisor and engage in a respectful manner that spanned a year and a half. (JA219, 221, 227, 287-90, 297, 317-19, 321-23, 325-29). Simmons herself acknowledges that her

37

relationship with Lee was problematic, having gone to Human Resources herself to seek guidance. (JA229-31).

It belies common sense that Simmons would argue that UM Capital has provided shifting reasons for her termination. The justification for Simmons' termination has been the problematic ongoing dynamic she was made aware of very shortly after her employment started at UM Capital. Simmons was put on notice that her behavior and engagement with Lee was unacceptable within the first 60-days of her employment and thereafter on a regular and consistent basis throughout her employment. That Simmons disagreed or felt that she was in the right, is immaterial.[9]

In short, Simmons simply failed to put forth any evidence from which a reasonable juror could infer that she did not engage in the behavior upon which Lee and Connerney relied to make the decision to terminate her employment or that her termination was because of a disability.

---

[9] Simmons' efforts to undermine the credibility of Connerney and Lee is likewise futile. First, credibility determinations are not made at the summary judgment stage. Moreover, Simmons has identified no inconsistencies with the underlying truthfulness of the statements by Lee and Connerney. Instead, Simmons merely tries to recharacterize such statements in an attempt to attribute some ill intent. These are exactly the type of minor discrepancies that do not cast doubt on the explanation and have been found to not create a genuine dispute. *See e.g., Manufacturers & Traders Tr. Co.*, 429 F. Supp. 3d at 121.

**C.      The District Court Did Not Err in Determining Simmons Failed to Show She Engaged in Protected Activity Under the FCA/MFCA[10]**

Simmons contends that the district court erred in finding that she did not have an objectively reasonable belief that UM Capital was soon going to violate the FCA or MFCA[11]. However, the only evidence in the record to support Simmons' position is her baseless speculative testimony, which was not enough to survive summary judgment. *See Wadley*, 264 F. App'x at 281 (4th Cir. 2008); *Nat'l Wildlife Fed'n*, 497 U.S. at 888.

To establish a *prima facie* case of retaliation, Simmons had to demonstrate that (1) she took action "in furtherance" of a *qui tam* suit, *i.e.*, engaged in "protected activity," (2) UM Capital knew of this action, and (3) UM Capital retaliated against her as a result of these actions. *Eberhardt v. Integrated Design & Constr, Inc.*, 167 F.3d 861, 866 (4th Cir. 1999) (internal cited omitted). Although Simmons alleges that UM Capital retaliated against her because of her actions when she was terminated, she has failed to present any evidence or argument demonstrating that she engaged in protected activity under the FCA or MFCA.

---

[10] Because the district court found that Simmons did not establish a *prima facie* case of retaliation under the FCA or MFCA, it did not reach the issue of whether UM Capital's proffered reason for Simmons' termination was pretextual. If the district court had addressed the issue, it would have found as a matter of law that UM Capital was entitled to judgment as a matter of law for the same reasons as Simmons' ADA discrimination claim fails. *See infra* at 43.

[11] Simmons addressed her claims under the FCA and MFCA collectively. (Appellant Br. 50 n.8). Appellee responds accordingly.

The "protected activity" requirement of a retaliation cause of action requires that an employee take some action "in furtherance" of a *qui tam* suit. 31 U.S.C. § 3730(h). The statute specifically protects "investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." *Eberhardt*, 167 F.3d at 867. Actions in furtherance of a *qui tam* suit generally include "situations in which litigation could be filed legitimately and excludes those in which an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof." *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) (internal quotation marks and citation omitted). "[M]ere reporting of concerns to supervisors" does not amount to protected activity under the act. *Glynn v. Impact Science & Tech., Inc.*, 807 F. Supp. 2d 391, 403, 407-08 (D. Md. 2011).

To sufficiently demonstrate engagement in protected activity, Simmons needed evidence that met the "distinct possibility" standard. *Mann*, 630 F. 3d at 344. "Under this standard, protected activity occurs when an employee's opposition to fraud takes place in a context where 'litigation is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when . . . litigation is a reasonable possibility.'" *Id*. The district court correctly determined that Simmons could not meet this high bar because the record showed that the only instruction

Simmons ever received was an instruction to *collect* data to assess bed usage. (JA306-07, 309-12).

First, while Simmons claims that she was "improperly instructed by Lee to add the PACU-ICU and ICU bed numbers" (Appellant Br. 52), the record is clear that Lee's direction was to count "device/patient days" and Lee specifically noted that she would like ***"PACU to tally their numbers separate from ICU to validate process."*** (JA306-07 (emphasis added)). Lee reiterated this in response to Simmons' December 28, 2018, email where Lee specifically stated "PACU ICU beds: because of that uncertainty of the bed utilization, we need to start collect[ing] data to determine further about this." (JA309-12).

Simmons' opposition and resistance to complying with Lee's direction at most was a disagreement with Lee's approach and speculation about a potential outcome *if* the patient data was validated such that the overflow PACU beds were permanently designated as ICU beds. Simmons provides no authority to support the proposition that merely reporting such a potential concern is sufficient to show protected activity under the FCA or MFCA.

The fact that Simmons reached out to NHSN by email on December 21, 2018, did not create a genuine dispute that it was an effort to stop any potential fraudulent activity. The district court correctly determined that the undisputed facts showed Simmons was not alerting NHSN to any false reporting by her employer but was

instead inquiring about how data may be reported in compliance with NHSN.

Unfortunately for Simmons, the guidance from NHSN supported Lee's plan:

> Thanks for your question. For your hypothetical situation, I would only add a virtual location for those designated ICU beds if they were to meet the 80/20 rule consistently every month. They would report data separate in this unit apart from other ICU units. If this area does not meet the 80/20 rule for ICU beds, it will have to be classified as a different location that meets an NHSN definition.

(JA314).

The district court correctly determined that taking into consideration *all of the evidence* in the record Simmons did not have a reasonable belief that UM Capital would soon engage in any fraudulent activity under the FCA or MFCA. Simmons has no evidence that Lee was involved in the penalties and rewards process for the Hospital, and Simmons has no evidence demonstrating that she had a reasonable belief that Lee was involved or could otherwise affect any funding the Hospital received. (JA170). Further, Simmons herself was not involved in this component of the hospital administration and had no formal training. (JA246-48). Moreover, once Lee confirmed, in a contemporaneous email, what her instruction was—to collect data to decide "next step[s]" at a future date" Simmons indisputably did not have a reasonable belief that fraud was imminent.[12]

---

[12] Again, Simmons' argument that Lee commented it would be "convenient" to combine the beds and acknowledged that conversations occurred discussing the possibility of doing so at some future date, does nothing to create a genuine dispute

The district court properly considered the evidence in the record in making its determination that Simmons did not engage in protected activity. On appeal, Simmons essentially asks the Court of Appeal to rely on her speculative testimony instead of Lee's testimony and corresponding documentation, arguing that Lee's unspoken, unverified, undocumented, alleged plan for the data at some point in the future (a plan that only Simmons was supposedly aware of) was flawed or improper—yet this is exactly the type of imagined fraud that the statute does not protect. *See Mann*, 630 F.3d at 344 (finding that actions in furtherance of a *qui tam* suit generally "excludes those in which an employee . . . fabricates a tale of fraud to extract concessions from the employer, or . . . just imagines fraud but lacks proof.") (internal quotation marks and citation omitted).

Even if Simmons had shown that she engaged in protected activity under the FCA or MFCA, which she cannot, she still failed to establish that such action was a factor in UM Capital's decision to terminate her employment. If an employee establishes a *prima facie* case of retaliation, the burden then shifts to the employer to articulate a legitimate, non-retaliatory basis for the adverse employment action. *See United States ex rel. Dillard v. Fluor Corp.*, 22-1450, 2023 WL 8618545, at *1 (4th Cir. Dec 13, 2023) (citing *Walton v. Harker*, 33 F.4th 165, 177-78 (4th Cir.

---

of fact that Lee only ever asked Simmons to collect data to determine how the beds could be utilized and reported.

43

2022) (discussing retaliation claims in context of Title VII)); *Lestage v. Coloplast Corp.*, 982 F.3d 37, 47 (1st Cir. 2020) (applying framework to FCA action). If the employer makes this showing, the burden shifts back to the employee to rebut the employer's evidence by showing that the employer's purported non-retaliatory reasons were pretextual. *Walton*, 33 F.4th at 178; *Lestage*, 982 F.3d at 47.

As noted above, there is no dispute that UM Capital had a non-retaliatory reason for terminating Simmons' employment. Lee and Connerney made the decision, in conjunction with Human Resources, to terminate her employment based on her repeated and demonstrated inability to cooperate with her supervisor and engage in a respectful manner that spanned a year and a half. (JA219, 221, 227, 287-90, 297, 317-19, 321-23, 325-29). It is undisputed that prior to Simmons contacting NHSN or refusing to violate a non-existent instruction, Lee and Connerney noted to Simmons and Human Resources that she was insubordinate, was not collaborative and was disrespectful to Lee. There simply is no evidence in the record that created a genuine dispute that Lee and Connerney were dishonest about the reason for Simmons' termination.

## IX. CONCLUSION

For the foregoing reasons, UM Capital respectfully requests that the Court of Appeals **AFFIRM** the district court's order granting summary judgment and award

UM Capital attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

Dated: August 27, 2025

Respectfully submitted,

 /s/Alison N. Davis
Alison N. Davis
Morgan L. Kinney
LITTLER MENDELSON, P.C.
815 Connecticut Ave NW, Suite 400
Washington, DC 20006
202.286.3135 (Telephone)
Andavis@littler.com
mkinney@littler.com

*Counsel for Defendant-Appellee*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the page limitation of Fed. R. App. P. 32(a)(7)(A) because this brief contains 10,367 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally space typeface using in Times New Roman 14-point font.

*/s/ Alison N. Davis*
Alison Davis

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of August 2025, a true and correct copy of the foregoing Brief was filed electronically with the U.S. Court of Appeals for the Fourth Circuit, which will send a notice of the filing to all counsel of record.

*/s/ Alison N. Davis*
Alison N. Davis

46