CASE NO. 25-1430

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

KRISTIN SIMMONS,

*Plaintiff – Appellant*,

v.

UM CAPITAL REGION HEALTH, INC.; DIMENSIONS HEALTH
CORPORATION d/b/a UM CAPITAL REGION HEALTH, INC.

*Defendants – Appellees.*

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF MARYLAND
Case No. 1:21-cv-02074, Hon. Matthew J. Maddox

## REPLY BRIEF FOR PLAINTIFF-APPELLANT
## KRISTIN SIMMONS

Joyce E. Smithey, Esq.
Reuben W. Wolfson, Esq.
Liesel J. Schopler, Esq.
Smithey Law Group LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com
liesel.schopler@smitheylaw.com

*Counsel for Plaintiff-Appellant Kristin Simmons*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ..................................................................................... 5

    I.    Defendants Premise Their Arguments On Disputed Facts, Which Were Improperly Discounted By The District Court. ………..……………... 5

        A.    Evidence Contradicts the Claim that Simmons was Terminated for Performance and Behavior Problems. ……………....……... 6

        B.    Evidence Contradicts the Claim that Simmons had No Objectively Reasonable Belief that Defendants Would Soon Violate the FCA. ………………………………………………….. 10

        C.    Defendants Misapply The Summary Judgment Standard. ….. 13

            1.    Simmons's Evidence is More Than Self-Serving Unsubstantiated Statements and Personal Beliefs. …....13

            2.    Simmons's Evidence Does Not Focus on Wholly Irrelevant Matters or Highlight Non-Existent, Immaterial Discrepancies. …………………………………….... 17

        D.    Defendants Fail to Vindicate the District Court's Improper Consideration of the Evidence. ………………………….....19

    II.    The Grant Of Summary Judgment On Simmons's Discrimination Claim Should Be Reversed As Defendants' Arguments Fail To Refute That There Are Triable Facts Capable Of Proving Defendants' Reasons For Terminating Simmons Are Pretext. ………..………………....23

III.    The Grant Of Summary Judgment On Simmons FCA Retaliation Claims Should Be Reversed As Defendants' Arguments Fail To Refute That There Are Triable Facts Capable Of Proving That Simmons Engaged In Protected Activity. ……………………………..….26

CONCLUSION ..............................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Barber v. Coastal Horizons Ctr., Inc.*, No. 7:21-cv-00061-M,
2024 U.S. Dist. LEXIS 53240 (E.D.N.C. Feb. 5, 2024) ........................... 29

*EEOC v. Mfrs. & Traders Tr. Co.*,
429 F. Supp. 3d 89 (D. Md. 2019) ..................................... 17, 18, 19, 20, 23

*Fisch v. New Heights Acad. Charter Sch.*, No. 12-2033,
2012 U.S. Dist. LEXIS 131603 (S.D.N.Y. Sept. 13, 2012) ...................... 29

*Haywood v. Locke*,
387 Fed. Appx. 355 (4th Cir. 2010) ......................................................... 25

*Hearn v. Edgy Bees Inc.*, No. 21-2259,
2023 U.S. Dist. LEXIS 72677 (D. Md. Apr. 25, 2023) ............................. 27

*Hollis v. Morgan State Univ.*, No. 24-1476,
2025 U.S. Dist. LEXIS 22163 (4th Cir. Aug. 27, 2025) ........... 7, 20, 21, 29

*Hux v. City of Newport News*,
451 F.3d 311 (4th Cir. 2006) ............................................................. 17, 18

*Lujan v. Nat'l Wildlife Fed.*,
497 U.S. 871 (1990) .......................................................................... 14, 15

*Muth v. United States*,
1 F.3d 246 (4th Cir. 1993) ...................................................................... 5

*Ray v. Roane*,
93 F.4th 651 (4th Cir. 2024) ................................................................... 23

*Theriot v. Parish of Jefferson*,
185 F.3d 477 (5th Cir. 1999) ................................................................... 5

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ...................................................... 26, 27, 28

*Vessels v. Kaydon Ring & Seal, Inc.*, No. JKB-17-1516,
    2018 U.S. Dist. LEXIS 106272 (D. Md. June 26, 2018),
    *aff'd sub nom.*, 749 F. App'x 211 (4th Cir. 2019)............................. 21, 22

*Wadley v. Park at Landmark LP*,
    264 Fed. Appx. 279 (4th Cir. 2008) ................................................. 14, 15

*Wannamaker-Amos v. Purem Novi, Inc.*,
    126 F.4th 244 (4th Cir. 2025) .......................................................7, 24, 25

*Wright v. Southwest Airlines*,
    319 Fed. Appx. 232 (4th Cir. 2009) .......................................................... 5

## Federal Statutes

31 U.S.C. § 3729 *et seq.* ("FCA").......................................................... 1

31 U.S.C. § 3730(h)(1).................................................................. 27, 28

42 U.S.C. § 12101 *et seq.* ("ADA")........................................................ 1

## State Statutes

Md. Code Ann., Health-Gen. § 2-601, *et seq.* ("MFCA").................................... 1

## Rules

Fed. R. Civ. P. 56 ............................................................................19

iv

## INTRODUCTION AND SUMMARY OF ARGUMENT

The record provides ample support for a jury to find that UM Capital Region Health, Inc. and Dimensions Health Corporation, d/b/a UM Capital Region Health, Inc. (collectively, "Defendants") discriminated against Appellant Kristin Simmons ("Simmons") under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 *et seq*. ("ADA"), and retaliated against her in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq*., and the Maryland False Claims Act, Md. Code Ann., Health-Gen. § 2-601, *et seq.* (collectively with the False Claims Act, "FCA").[1] Defendants' arguments to the contrary rely upon disputed facts and incorrect legal standards.

As for Simmons's discrimination claim, Defendants allege that Simmons's employment was terminated for purported performance and conduct issues that occurred throughout her employment. However, that allegation is clearly disputed by evidence including that Simmons's annual performance evaluation, which covered *12 of the approximate 17 months* Simmons was employed by Defendants, was favorable and contains <u>no</u> mention of performance or conduct problems, and the

---

[1] As noted by the district court, judges look to FCA case law for guidance when addressing claims brought under the MFCA. JA638. As such, the claims under the FCA and MFCA are being addressed jointly here, and the term "FCA" is being used to refer to both collectively.

1

fact that, contrary to Defendants' fallacious assertion, Simmons was never disciplined in accordance with their progressive discipline plan.

Further, while Defendants claim that Simmons's supervisor, Yeo-Jin Lee ("Lee"), and Lee's supervisor, Ingrid Connerney ("Connerney"), repeatedly tried to coach Simmons on the alleged behavior problems, including by seeking assistance from HR, there is not one example of Lee or Connerney directly going to HR about Simmons with the exception of during Simmons's initial 90-day probationary period, and then when seeking her termination over a year later. Rather, outside of Simmons's probationary period and in seeking Simmons's termination, all actions taken by Lee and Connerney were *in response to Simmons going to HR* to complain about Lee's discriminatory conduct towards her, conduct that included Lee discriminatorily criticizing Simmons, which was palpable to the rest of the Infection Prevention ("IP") team.

Also, the evidence shows that Lee ceased having one-on-one meetings with Simmons *four months* prior to Simmons's termination while continuing to hold such meetings with Simmons's co-workers. As Lee testified that those meetings are important for coaching and are learning opportunities for employees with performance struggles, it can be inferred from the evidence that Simmons did not have a serious behavior problem for which Lee and others were trying to coach Simmons. Moreover, Lee's cessation of one-on-one meetings with Simmons while

2

continuing to do so for her other direct reports is evidence of discriminatory action in and of itself.

Turning to Simmons's FCA retaliation claims, Defendants apply outdated law in alleging that Simmons needed to demonstrate that she took "action in furtherance of *qui tam* suit" and needed "evidence that met the distinct possibility standard" to show that she engaged in protected activity. Rather, Simmons need only demonstrate that she had an "objectively reasonable belief" that Defendants would soon violate the FCA and that she made "efforts to stop" those violations. The proffered evidence, which shows that Simmons investigated and vehemently objected to Defendants' proposal to combine infection data of two physically separate areas contrary to the National Healthcare Safety Network ("NHSN") rules, as that would wrongly manipulate the data, and thereby, fraudulently impact funding from Maryland and/or the federal government to Defendants, allows a reasonable trier of fact to conclude Simmons engaged in protected activity.

Moreover, contrary to Defendants' argument, whether Simmons was instructed to combine infection data for two physically separate areas – the Post-Anesthesia Care Unit ("PACU") and main Intensive Care Unit ("ICU") areas – is a *disputed* fact.  Evidence showing such a dispute includes the fact that Simmons, who had previously witnessed Lee lie about data, (1) sent contemporaneous emails stating (i) that Lee had instructed her to combine the PACU and main ICU numbers,

3

including in an email to Lee to which Lee did not object in response, and (ii) that Simmons was concerned over Defendants' plan to "pad the numbers" and that she was deeply concerned that Lee would violate NHSN rules, and thereby federal law, and (2) contacted NHSN to confirm the illegality of the plan and, after sharing that information with her fellow IPs and realizing that Lee was refusing to address her repeatedly voiced concerns, confronted Lee with that information in an effort to prevent Defendants from defrauding the government.

While Defendants purport that the evidence shows that they were only concerned about the 80% rule[2] and planned to devise a plan for collecting infection data only after confirming the 80% rule had been satisfied, this allegation conflicts with Lee's admitted order to Simmons to collect "device days" data, which has nothing to do with the 80% rule. There would have been no need to collect that infection data if Defendants were concerned only with the 80% rule.

As further proof that Defendants' focus on the 80% is a red herring that does not refute Simmons's FCA retaliation claims, Simmons expressly told Lee in an email that the 80% rule was irrelevant to Simmons's reporting concern because, even if the rule was satisfied, the numbers could not be combined under NHSN rules as the beds are located in physically separate areas, a NHSN rule that Lee testified is

---

[2] Under NHSN's 80% rule, a category of patients (*e.g.*, ICU patients) must utilize the beds at issue at least 80% of the time to be categorized under the category (*i.e.*, as ICU beds). The rule is also known as the 80/20 rule. App. Br., p. 11.

4

basic IP knowledge of which she was aware. Nevertheless, Lee continued to snub Simmons's repeatedly raised concern.

The fact that Simmons was fired mere weeks after Lee exploded on her for contacting NHSN to inquire about the legality of Lee's plan to combine infection data from two physically separate areas further would permit a jury to conclude that her employment was terminated in retaliation for her protected conduct and that Defendants' alleged reason of rude, disrespectful, and insubordinate behavior is pretext.

## ARGUMENT

I.      **Defendants Premise Their Arguments On Disputed Facts, Which Were Improperly Discounted By The District Court.[3]**

There are genuine disputes of material fact that preclude judgment as a matter of law on Simmons's discrimination and FCA retaliation claims that the district court

---

[3] In a footnote, Defendants accuse Simmons of alleging new facts and evidence that were not before the district court. Resp. Br., p. 3 n. 2. Yet, Defendants do not provide one example, which is unsurprising as that allegation is unfounded. Every fact and evidence cited by Simmons was before the district court, as indicated by Simmons's citations to materials that were exhibits in the case below and are contained in the Joint Appendix. The three cases cited by Defendants are inapposite as two of them concerned a party referencing "material outside of the record," *Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 (5th Cir. 1999), and *Wright v. Southwest Airlines*, 319 Fed. Appx. 232, 234 n.2 (4th Cir. 2009), and the third case concerned a party introducing a new legal theory (the "continuing injury" theory) to toll the statute of limitations for the first time on appeal. *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993). Simmons neither cites to material outside of the record nor raises a new legal theory on appeal.

5

erroneously overlooked or failed to give adequate consideration. Defendants' brief fails to refute this argument.

### A. Evidence Contradicts the Claim that Simmons was Terminated for Performance and Behavior Problems.

It defies logic that it is an "undisputed fact" that Simmons had concerning performance and behavior issues that, with the alleged exception of a short period in January 2018, lasted the entirety of her employment, Resp. Br., pp. 3, 9, 22-24, when Simmons received a favorable annual review, which covered 12 of the approximate 17 months of Simmons's employment.[4] *See* App Br., pp. 16-17. Simmons's annual review made *no mention* of problematic behavior and, instead, ranked Simmons the second highest rating (3 out 4, meaning "[r]esults meet performance standards") for all of the 16 competency categories, and in which Lee wrote that Simmons was "a self-directed, competent member of the IP team," and another department leader wrote that Simmons is "excellent." *Id*.

Further, as noted in Simmons's Opening Brief, almost all of Defendants' examples of Simmons's behavior problems either: (i) related to her disability (*e.g.*, giving "blank face"); (ii) lack evidentiary support (*e.g.*, alleged "disrespectful" emails); (iii) are contradicted by the evidence (*e.g.*, praise for Simmons's handling

---

[4] As Simmons's annual review clearly disputes Defendants' allegation of Simmons's egregious performance and behavior problems, it is no surprise that Defendants omit any mention of it in their brief. Resp. Br., *passim*.

of Medmind in Simmons's annual review, dated September 27, 2018, but then a grounds listed for Simmons's termination was her handling of an Medmind incident on July 10, 2018); and/or (iv) were *ad hoc* reasons given at the time of Simmons's termination (*e.g.*, honesty concerns). App. Br., pp. 6-7, 21-31. These discrepancies give rise to a genuine dispute of material fact as to whether continuous performance and behavior problems were truly the grounds for Simmons's termination or pretext.

Further disputing Defendants' claim that there is no evidence of pretext is the fact that Simmons was never disciplined and was not terminated in accord with Defendants' progressive discipline policy. App. Br., pp. 18-20. *See Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 260 (4th Cir. 2025) ("Evidence that a company failed to follow its own discipline policies in firing an employee can also be probative of pretext." (Citations omitted)); *Hollis v. Morgan State Univ.*, 2025 U.S. Dist. LEXIS 22163, at *28 (4th Cir. Aug. 27, 2025) ("[D]eviations [from internal policies] *themselves* are the circumstantial evidence from which pretext and discriminatory intent may be inferred." (Citations omitted)).

Defendants' claim that they adhered to their progressive discipline policy in terminating Simmons, Resp. Br., pp. 35-36, falls flat. First, while Defendants declare that immediate termination may be "warranted" under their progressive discipline policy, they conveniently omit mention of the limited exceptions outlined in the policy for which immediate termination is "warranted." *See* App. Br., pp. 18-20

7

(detailing limited circumstances for which immediate termination is warranted). *None of the conditions warranting immediate dismissal applied in Simmons's case. Id*. Furthermore, even if immediate termination was warranted – which it wasn't – Defendants still failed to act in accordance with the policy's requirement that an employee be provided the grounds for any disciplinary action and be given an opportunity to explain any allegations of misconduct raised against them. *Id.*

Even assuming *arguendo*, that immediate termination is an option under the progressive discipline policy where substantial coaching efforts are made over an extended period to address performance and behavior problems, there are material factual disputes as to any such coaching efforts, which further leads to the reasonable inference that there was no such serious behavior problems let alone that Simmons's termination was in accord with the progressive discipline policy. For example, while Defendants tout that Lee and Connerney tirelessly tried to coach Simmons and involved HR as to their problems with her, Resp. Br., pp. 3, 22, 36, there is *not one example* of Lee or Connerney directly going to HR to complain about Simmons, excepting during Simmons's probationary period and when they sought to terminate Simmons. Rather, excepting Simmons's probationary period and termination, all HR involvement discussed in Defendants' brief was at Simmons's request to address Lee's discriminatory conduct towards her. *See* App. Br, pp. 26-27. In fact, HR's email to Simmons, dated April 23, 2018, clearly indicates that, as of that date,

8

Simmons was *not* in violation of any Defendants' policies to HR's knowledge. JA497 (mistakenly thinking Simmons thought she was not required to have *ad hoc* discussions with Lee, which Simmons replied she understood, Margaret Fisher of HR advised Simmons to read the Professional Behavior Policy and the Progressive Disciplinary Action Policy and stated, "I definitely would not suggest or encourage you to sanction communication with your direct manager to the point that you *might* be in violation of these policies." (Emphasis added)).

Even more astounding, Defendants declare, "Lee made every effort to improve her relationship with Simmons, but to no avail[,]" Resp. Br., 3, while it is undisputed that Lee ceased having one-on-one meetings with Simmons approximately four months before Simmons's termination, meetings which Lee continued to have with Simmons's colleagues and for which Lee testified are important meetings to "coach [her direct reports] individually" and are an learning opportunity for employees with performance struggles. JA566. If Lee ceased holding those meetings with Simmons months prior to her termination, the reasonable inference is that Simmons did not have any performance struggles that needed coaching and, at a minimum, Defendants were not making any sincere efforts to coach or work with Simmons, thus establishing pretext.

9

**B.     Evidence Contradicts the Claim that Simmons had No Objectively Reasonable Belief that Defendants Would Soon Violate the FCA.**

Defendants claim the undisputed evidence shows that Simmons had no objectively reasonable belief that they would soon violate the FCA because Lee never instructed Simmons to combine infection data for PACU beds, which were located in a physically separate area, with data for the main ICU beds, and instead merely instructed her to collect data to confirm whether the 80% rule was satisfied as to the PACU beds. Resp. Br., pp. 14-19. *See id.* at p. 19 (Lee "merely [instructed Simmons] to verify the patient population [as to the beds located in the PACU]"). Defendants allege that only after "the population data could be verified (*i.e.*, meaning if it met the [80% rule] utilization requirement)" would they "develop a plan for reporting the additional beds to NHSN." *Id.* at p. 15. This claim is disputed on multiple grounds.

First, accepting as true that Defendants were solely concerned as to whether the 80% rule was satisfied, then the only data needed was patient population utilizing the PACU beds (*i.e.*, PACU patient, ICU patient, etc.). Resp. Br., p. 15 (explaining that the 80% rule requires that the 4 PACU beds be occupied by ICU patients 80% of the time to be designated as ICU beds for reporting purposes). As such, there was no need for Simmons to collect infection data (*i.e.*, device days) for the beds located in the PACU area, which Defendants concede Lee instructed Simmons to collect. *Id.*

10

at p. 18. Thus, the fact Simmons was asked to collect infection data refutes Defendants' claim that the undisputed evidence shows that the data collection task assigned to Simmons solely concerned whether the 80% rule was satisfied.

Second, if Defendants were solely concerned about the 80% rule and, only after confirming that rule was satisfied, would they decide on how to report infection data for the beds located in the PACU area, there would have been no reason for Lee to have admittedly discussed combining the PACU and main ICU infection data. Resp. Br., pp. 42-43 n. 12. Defendants attempt to shrug this off by arguing that the fact that Lee had conversations about combining the PACU area and ICU area infection data "does nothing to create a genuine dispute issue of fact that Lee only ever asked Simmons to collect data to determine how the beds could be utilized and reported [*i.e.*, data as to whether the 80% rule was satisfied.]" *Id.* However, as discussed, Lee did not "only ever ask[ ] Simmons to collect" to patient population data; she also asked her to collect infection data. *Id.* at p. 18. As Lee asked Simmons to collect that data and admittedly discussed combining those numbers with the main ICU numbers, there is a genuine dispute of material fact as to whether Simmons had an objectively reasonable belief that Defendants would soon violate the FCA.

Third, further reinforcing Simmons's objectively reasonable belief that Defendants would soon violate the FCA is the fact that Lee refused to respond to Simmons's repeated concerns that the data could not be combined – *regardless of*

11

*whether the 80% rule was satisfied* – because data could not be combined for physically separate areas, an elementary NHSN rule for which Lee was aware. App. Br., pp. 11-15, 46-50.

Defendants place great weight on the December 21, 2018, huddle notes, which state, "PACU to tally their numbers separate from ICU to validate process." Resp. Br., pp. 16, 41. However, this one note does not establish as an undisputed fact that Lee never instructed Simmons to combine the PACU area and ICU area data. There is conflicting evidence including: (i) Lee admittedly having discussed combining that data, App. Br., pp. 12-13; (ii) Lee not substantively responding to Simmons's email, dated December 28, 2018, which was *after the December 21, 2018 huddle meeting*, wherein Simmons wrote, ". . . I'm not sure it's acceptable, from an NHSN perspective, to simply add the PACU-ICU numbers into the main ICU numbers, *as you instructed*[,]" JA311 (emphasis added); (iii) Simmons's contemporaneous email to her fellow IPs forwarding the NHSN response, dated December 28, 2018, stating, "No, you can't add the PACU-ICU beds into the main ICU denominator to *pad the numbers*. . . . I don't think this is going to end well. I'm forwarding this to you guys as an insurance plan in case [Lee] somehow tries to pin this on me[,]" JA314; and (iv) Simmons's contemporaneous email to Connerney, dated January 14, 2019, stating that Lee dismissed Simmons's concerns about Lee's plan to combine the PACU area and ICU area infection data, which Simmons knew was impermissible

12

under NHSN rules and that she had confirmed such with NHSN, and that Simmons "would not want our facility to suffer any repercussions for violating NHSN's rules and I am deeply concerned that [Lee] would seemingly readily ignore those rules (*and therefore federal law*), had she not been presented with incontrovertible evidence." JA442 (emphasis added).

In addition to this evidence showing that Lee had instructed Simmons to fraudulently combine infection data from two physically separate areas, further evidence raises a genuine dispute of material fact as to whether Simmons had an objectively reasonable belief that Defendants would soon violate the FCA including: (i) that, as Defendants acknowledge, they had a history of regulatory/compliance issues, *see* Resp. Br., p. 4 ("UM Capital had experienced quality and regulatory issues in prior years"), p. 10 (Connerney "had been hired to help turn things around for the Hospital in terms of QC and compliance"); and (ii) that Simmons had previously observed Lee lie as to data in mock joint commission surveys, *id.* at pp. 45-46.

### C.    Defendants Misapply The Summary Judgment Standard.

#### 1.    Simmons's Evidence is More Than Self-Serving Unsubstantiated Statements and Personal Beliefs.

Defendants accuse Simmons of "misstat[ing] the standard the district court was required to utilize at summary judgment" because, while "the lower court must view all the facts, including all reasonable inferences, in the light most favorable to

13

the nonmovant party, self-serving, unsubstantiated statements and personal beliefs, *without more* are not sufficient to overcome summary judgment." Resp. Br., p. 27 (citations omitted) (emphasis in original). However, Defendants fail to clarify how Simmons "misstated" the standard. And it is Defendants who improperly apply the law in claiming that Simmons's evidence does not amount to "more" than "self-serving, unsubstantiated statements and personal beliefs." *Id.*

The cases cited by Defendants – *Wadley v. Park at Landmark LP*, 264 Fed. Appx. 279 (4th Cir. 2008), and *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871 (1990) – make clear that the "more" needed to overcome summary judgment exists in this matter unlike in those cases. In *Wadley*, the appellant, a Section 8 tenant, claimed that he was unlawfully discriminated against based on his race and disability when the appellees, rental property operators, decided to pursue market-rate tenants after they were released from a restrictive convenant that had required them to lease at least 20% of the rental units to Section 8 tenants. 264 Fed. Appx. At 280-81. This Court affirmed the grant of summary judgment because the appellant "presented *no evidence* sufficient to withstand summary judgment with regard to his claim of discriminatory intent and impact in either Appellees' enactment of the Section 8 non-renewal policy or in the termination of [his] lease." *Id.* at 281 (emphasis added). The Court observed that the appellant's "own self-serving, unsubstantiated statements in

14

opposition to Appellees' evidence in this regard is insufficient to stave off summary judgment." *Id.*

In *Lujan*, the U.S. Supreme Court reversed the denial of the government's motion for summary judgment where a wildlife federation challenging the government's decisions to withdraw parcels of land for retention by the government under the Federal Land Policy and Management Act (FLPMA), 43 U.S.C.S. § 1701 *et seq.*, because the only evidence submitted by the federation to contest summary judgment were two affidavits that failed to raise an issue of material fact as they did not show that the federation's recreational use and enjoyment extended to particular acres that were withdrawn out of the thousands of acres of land that were not. 497 U.S. at 888-89. The Court held that conclusory statements lacked the specificity needed to show facts in dispute. *Id.*

*Wadley* and *Lujan* stands in stark contrast to this matter as Simmons, contrary to Defendants' assertion, presents evidence other than her own self-serving, unsubstantiated, conclusory statements. Specifically, as further detailed in Simmons's Opening Brief and above, Simmons's evidence of pretext includes the derogatory statements that Lee and Connerney made about her disability's impact on her face and muscles, App. Br., pp. 6-7, the examples of differential treatment of her compared to her non-disabled IP colleagues, *id.* at pp. 7-10, her favorable annual performance evaluation, *id.* at pp. 16-17, the lack of any disciplinary action taken

15

against Simmons prior to her termination, *id.* at pp. 18-20, and the many noted incongruities as to the alleged reasons listed by Lee and Connerney as grounds for Simmons's termination, *id.* at pp. 21-31.

Likewise, Simmons's evidence that she had a reasonable belief that Defendants would soon violate the FCA includes: (i) contemporanous documents noting that Lee had instructed her to fraudulently combine the infection data for two physically separate areas, including in an email to Lee to which Lee did not object to that statement in her response, App. Br., pp. 11-15, 46-50; (ii) Lee's refusal to address Simmons's repeatedly raised concern that infection data from phsycially separate areas could not be combined under the NHSN rules, an elementary and well-known rule for IPs, *id.*; (iii) Simmons's inquiry to NHSN confirming that Defendants' intended plan to combine infection data from two physically separate areas violates NHSN rules, *id.* at pp. 14-15; (iv) Defendants' history of regulatory/compliance transgressions, Resp. Br., pp. 4, 10; (v) that Simmons had previously observed Lee lie as to data in mock joint commission surveys, App. Br., pp. 45-46; and (vi) Defendants' failure to explain why Lee admittedly instructed Simmons to gather infection data for PACU beds when that data has no impact on whether the 80% rule was satisfied, and, in any event, satisfying the 80% rule has no bearing on the fact that infection data from two physically separate areas count <u>cannot</u> be combined under NHSN rules, Resp. Br., *passim*.

16

Viewing the facts and reasonable inferences in Simmons's favor, the evidence is sufficient to create a genuine issue of material fact as to pretext and, thereby, to withstand  summary judgment with regard to her discimination claim. In a similar vein, viewing the facts and reasonable inferences in Simmons's favor, the evidence is sufficient to create a genuine issue of material fact as to whether Simmons had an objectively reasonable belief that Defendants would soon violate the FCA and, thereby, to withstand summary judgment with regard to her FCA retilation claims.

### 2.    Simmons's Evidence Does Not Focus on Wholly Irrelevant Matters or Highlight Non-Existent, Immaterial Discrepancies.

Defendants' argument that there is an "absence of material in the record to support an inference of discrimination," Resp. Br., p. 28, because Simmons's evidence "focus[es] on wholly irrelevant matters and highlight[s] non-existence discrepancies, which are not material," *id.*, is also baseless, as demonstrated by the caselaw cited by Defendants – *Hux v. City of Newport News*, 451 F.3d 311 (4th Cir. 2006), and *EEOC v. Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d 89 (D. Md. 2019).

In *Hux*, this Court found that the plaintiff did not withstand summary judgment in her sexual discrimination lawsuit for failure to promote where, in claiming she was more qualified than the male candidates selected, she compared herself to those who received promotions on the basis of only one factor out of the multiple factors considered and that one factor changed with every comparison. 451

F.3d at 315-17. This Court explained, "A plaintiff cannot create a triable issue by selecting from the many criteria used in the promotions process the one factor on which he or she may conceivably compare." *Id.* at 317. In *Mfrs. & Traders Tr. Co.*, the court found that the alleged circumstances, whether considered individually or collectively, failed to support a finding of pretext and noted that "when a plaintiff has presented nothing sufficient to raise a material issue of fact to place before the fact finder, her claim will not survive a motion for summary judgment." 429 F. Supp. 3d at 122-23.

These cases are inapposite. Simmons's evidence of pretext is not "focus[ed] on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." *Hux*, 451 F.3d at 315; *Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 121 (same). Rather, Simmons "proffer[ed] sufficient evidence such that a reasonable trier of fact could conclude that [Defendants'] explanation is false or 'unworthy of credence,' [ ] and that discrimination was the true reason for the adverse employment action." *Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 122 (citations omitted).

As discussed, Simmons has done so by: (1) presenting evidence "that directly contradicts the employer's proffered justification," *Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 122 – *e.g.*, her favorable annual performance review lacking any mention of concerning performance or behavior problems, App. Br., pp. 16-17; and (2) "by

18

amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons," *id.* (internal quotations omitted) – *e.g.*, negative comments made by Lee and Connerney about Simmons's face and Lee's discriminatory treatment of Simmons, including carrying a notebook with Simmons's name on it while not doing the same as to Simmons's co-workers and by unduly criticizing ideas proposed by Simmons, as acknowledged by Simmons's IP colleague, Cindy Rosenberger ("Rosenberger"), *id.* at 6-9.

Defendants' claim that Simmons lacks corroborating evidence, Resp. Br., p. 28, is unfounded as facts, including Simmons's annual performance evaluation, the disregard of progressive discipline policy as to Simmons and Rosenberger's testimony, are indeed corroborating evidence. Accordingly, contrary to Defendants' assertion, *id.*, this case concerns "weighing the evidence," and therefore, summary judgment is inappropriate. *See Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 101.

### D. Defendants Fail to Vindicate the District Court's Improper Consideration of the Evidence.

Defendants focus on only three evidentiary issues in claiming that the court below properly considered all evidence in accordance with the mandates of Fed. R. Civ. P. 56: (1) Lee's discontinuance of one-of-one meetings with Simmons; (2) Defendants' characterization of Simmons's performance; and (3) Lee's and Connerney's testimony concerning Simmons's FCA retaliation claims. Resp. Br., pp. 29-33. Defendants' arguments as to each issue lacks merit.

1. <u>One-on-one meetings</u>. Defendants take the nonsensical position that Simmons proffers evidence of Lee ceasing to hold one-on-one meetings during Simmons's final four months of employment as proof that she had major conduct problems. Resp. Br., p. 29. This evidence is proffered for the exact opposite reason – to show that there were no such alleged behavioral problems, let alone that there were problems for which Defendants had been actively trying to coach Simmons. This fact, especially when considered with the other circumstantial evidence, is far from being a "minor discrepancy" or "wholly irrelevant," and instead, shows that Defendants' explanation is unworthy of credence. *Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 121.

Defendants further argue that the discontinuance of one-on-one meetings bears no significance because Simmons fails to connect her disability to that "adverse action," and Simmons does not challenge the grant of summary judgment on her ADA retaliation claim. Resp. Br., p. 30. This argument fails as the discontinuance of one-on-one meetings is evidence for which a reasonable trier of fact could conclude that Defendants' claim that it terminated Simmons's employment because she had serious behavior problems for which they unsuccessfully tried to her coach her is unworthy of credence. Also, it is evidence of discriminatory action *itself*, rather than evidence of retaliation. *See Hollis*, 2025 U.S. Dist. LEXIS 22163, at *28.

20

2. <u>Defendants' characterization of Simmons's performance</u>. Defendants incorrectly claim that its evidence of Simmons's purported rude, disrespectful and non-collaborative behavior is "corroborated extensively by the evidence in the record" while the only evidence disputing such behavior is Simmons's uncorroborated "personal and subjective belief." Resp. Br., pp. 30-31. In making that argument, Defendants patently ignore the evidence discussed above and in Simmons's Opening Brief (*e.g.*, Simmons's favorable annual performance review, the lack of any disciplinary conduct being taken against Simmons prior to her termination, and Simmons's colleagues' testimony that they had no problems collaborating with Simmons, and that Lee – rather than Simmons – was uncollaborative by criticizing ideas proposed by Simmons that she would welcome if proposed by another IP). Simmons "is entitled to dispute the credibility of the concerns asserted [by Defendants], and she has produced evidence to do so here." *Hollis*, 2025 U.S. Dist. LEXIS 22163, at *25 (citation omitted).

Defendants' reliance on *Vessels v. Kaydon Ring & Seal, Inc.*, 2018 U.S. Dist. LEXIS 106272 (D. Md. June 26, 2018), *aff'd sub nom.*, 749 F. App'x 211 (4th Cir. 2019), is misplaced. Resp. Br., p. 31. In *Vessels*, the terminated employee did not dispute that he lacked experience and had a record of inadequate job performance, which were the grounds for the adverse employment action taken against him. 2018 U.S. Dist. LEXIS 106272, at *20-23. He argued that many of his colleagues "were

bad at their jobs, not that [he] was good at his." *Id.* at \*23. That is not the case here as Simmons presents evidence, such as her annual performance review, disputing that she had problematic performance and behavior issues as claimed by Defendants to justify her termination.

In response to Simmons noting that the district court failed to properly consider that much of Defendants' evidence justifying the termination decision was not created until the time of that decision despite Defendants having alleged that the behavior problems persisted throughout Simmons's approximately year-and-a-half tenure, Defendants merely counter "that Simmons was made aware that her behavior was unacceptable during her probationary period." Resp. Br., p. 31. This strengthens Simmons's point – despite Defendants alleging that Simmons had significant performance and behavior problems throughout the entirety of her tenure, outside of Lee's and Connerney's self-serving testimony, Defendants can only turn to evidence of Simmons's behavior during her initial probationary period, behavior that clearly ceased as Simmons successfully completed her probationary period and no disciplinary action was taken against her until she was terminated over a year thereafter.

3. <u>Lee's and Connerney's testimony concerning Simmons's FCA retaliation claims</u>. As Defendants correctly note, Resp. Br., p. 32, the district court may not "weigh the evidence or make credibility determinations" because "[t]hat function is

22

reserved for a jury, and only if the movant shows that there is no genuine dispute as to any material fact may summary judgment be awarded." *Ray v. Roane*, 93 F.4th 651, 655 (4th Cir. 2024) (internal quotations omitted). However, that is what the district court did because, contrary to Defendants' assertion, Resp. Br., p. 32, the record is not "undisputed" as to whether Lee instructed Simmons to combine infection data from two physically separate locations. *See* App. Br., at pp. 11-15, 45-50; *infra*, p. 10-13. Thus, by discounting Simmons's evidence and instead giving full weight to Lee's and Connerney's testimony, the district court improperly made a credibility determination.

**II.      The Grant Of Summary Judgment On Simmons's Discrimination Claim Should Be Reversed As Defendants' Arguments Fail To Refute That There Are Triable Facts Capable Of Proving Defendants' Reasons For Terminating Simmons Are Pretext.**

Summary judgment on Simmons's discrimination claim hinges on whether she "present[ed] evidence or argument from which a factfinder could conclude that [Defendants'] proffered legitimate reason for [Simmons's] termination was pretextual, and that unlawful discrimination was the true reason." *Mfrs. & Traders Tr. Co.*, 429 F. Supp. 3d at 121 (citation omitted).

> A plaintiff may establish pretext through two routes. The first is offering evidence that the employer's justification is "unworthy of credence." As the Supreme Court explained in *Reeves*, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual

23

> reason for its decision." The second is adducing other forms of circumstantial evidence sufficiently probative of discrimination. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." If the plaintiff makes either showing of pretext, the case must be decided by a trier of fact and cannot be resolved on summary judgment.

*Wannamaker-Amos*, 126 F.4th 244, 257.

Contrary to Defendants' argument, Resp. Br., P. 35, Simmons has met this burden in multiple ways, including:

(i)    Evidence of falsity (*e.g.*, Simmons's favorable annual review containing no mention of ongoing performance and behavior problems and no record of any disciplinary action being taken against Simmons prior to her termination), *see Wannamaker-Amos*, 126 F.4th at 257-58;

(ii)    Shifting, conflicting reasons for Simmons's termination (*i.e.*, no reason to a laundry list of reasons including the NHSN incident and concerns with Simmons's lack of "honesty" to claiming Simmons's honesty and the NHSN incident were not factors in Simmons's termination and that it was based solely on alleged rude, disrespectful, and insubordinate behavior), *id.* at 258-59;[5]

(iii) Circumstantial evidence of discrimination (*e.g.*, Lee's and Connerney's comments about Simmons's face, Lee carrying around a notebook with Simmons's

---

[5] Defendants' attempt to refute the fact that its grounds for Simmons's termination were inconsistent over time, Resp. Br., pp.37-38, fails to counter the facts raised in

24

USCA4 Appeal: 25-1430      Doc: 37      Filed: 09/17/2025      Pg: 30 of 37

name on the cover while not doing so for other employees, Lee's discontinuance of one-on-one meetings with Simmons, and Rosenberger's testimony that Lee criticized ideas coming from Simmons but would not do the same if the idea was proposed Simmons's co-workers),[6] *id.* at 259-60; and

(iv) Defendants' failure to follow its disciplinary policy (*e.g.*, not following the progressive discipline steps and not providing Simmons the grounds for her termination nor giving Simmons an opportunity to explain any allegations of misconduct raised against her), *id.* at 260-61.[7]

---

Simmons's Opening Brief. *See* App. Br, pp. 20-21. Notably, as discussed in Simmons's Opening Brief, *id.* at pp. 15, 47-48, the NHSN incident is *not* evidence of rude or disrespectful behavior by Simmons; rather, as Simmons explicitly told Connerney in an email, dated January 14, 2019, Simmons was trying her best to be tactful and respectful in conveying to Lee that Lee's intended plan to combine infection data from two physically separate areas was improper under the NHSN rules. *Id.*

[6] Defendants bizarrely claim that there is no evidence that Simmons was treated differently than similarly situated individuals outside of her protected class. Resp. Br., p. 35. First, as noted in the case law cited by Defendants, "Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim." *Haywood v. Locke*, 387 Fed. Appx. 355, 359 (4th Cir. 2010). Further, things such as Lee making comments about Simmons's face, carrying around a notebook with Simmons's name on it, discontinuing one-on-one meetings with Simmons and criticizing Simmons's ideas – all things Lee did not do as to Simmons's non-disabled co-workers – are clearly evidence of Simmons being treated differently than similarly situated individuals outside of her protected class. *See also* App. Br., pp. 7-10 (discussing same).

[7] As discussed, *infra*, pp. 7-8, Defendants' claim that they "did not deviate from [their] Progressive Discipline Policy," rings hollow.

25

In its attempt to counter this evidence of pretext, Defendants contend, "The conflict between Simmons and Lee is well documented throughout the entirety of Simmons' employment." Resp. Br., p. 34 (citing JA219, 221, 287-90, 297). The mere four citations noted by Defendants further demonstrate that their assertion is unworthy of credence as: (i) two citations (JA219 and 221) are from Simmons's probationary period, which, pursuant to Defendants' disciplinary policy, should not be grounds for discipline as it was more than a year prior to the date of her termination, JA466; (ii) one citation (JA287-90) is Lee's *ad hoc* list of reasons to terminate Simmons that she created when seeking Simmons's termination; and (iii) one citation (JA297) was an email from Lee to Simmons recapping a one-on-one meeting held on July 13, 2018, that does not contain any mention of rude, disrespectful or insubordinate behavior by Simmons.

**III.    The Grant Of Summary Judgment On Simmons's FCA Retaliation Claims Should Be Reversed As Defendants' Arguments Fail To Refute That There Are Triable Facts Capable Of Proving That Simmons Engaged In Protected Activity.**

Defendants misstate the law by asserting that Simmons must demonstrate that she took "action 'in furtherance' of *qui tam* suit." Resp. Br., p. 39, 40. Prior to 2009, the FCA confined protected activity only to "measures taken in furtherance of" a *qui tam* suit. *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018). But, in 2010, Congress amended the FCA to "broaden[] the scope of protected activity." *Id.* at 201. Today, the FCA covers not only acts done "in

26

furtherance of" a *qui tam* suit, but also "*other efforts to stop*" violations of the acts. 31 U.S.C. § 3730(h)(1) (emphasis added).

Thus, the possibility of *qui tam* litigation is no longer a strict requirement to state a claim for retaliation under the FCA because an employee may also allege "efforts to stop" a FCA violation, "such as reporting suspected misconduct to internal supervisors." *Halasa v. ITT Educ. Servs.*, 690 F.3d 844, 847-48 (7th Cir. 2012) (finding a viable FCA retaliation claim where the complainant investigated suspected FCA violations and reported his findings "presumably to ensure that [the defendant] ended these practices and to prevent [it] from making any false certifications to the U.S. Department of Education"); *see also Grant*, 912 F.3d at 201 ("Where Congress expands the scope of activity protected by a statute, we cannot restrict ourselves to applying a narrower old standard that the expansion was intended to eschew.").

As Simmons has made clear, *see* App. Br., pp. 44-50, she engaged in protected activity under the second prong – "other efforts to stop" an FCA violation, which "is subjected to an objective reasonableness standard for protected activity," *Hearn v. Edgy Bees Inc.*, No. 21-2259, 2023 U.S. Dist. LEXIS 72677, at *17 (D. Md. Apr. 25, 2023) (citing *Grant*, 912 F.3d at 201), meaning that the facts must permit "the inference that a plaintiff's actions were motivated by an objectively reasonable belief

27

that the employer is violating, *or will soon violate*, the FCA." *Grant*, 912 F.3d at 201 (emphasis added).

However, Defendants ignore Simmons's argument and further misstate the law in declaring that Simmons needed "evidence that met the 'distinct possibility' standard" to demonstrate that she engaged in protected activity. Resp. Br., p. 40. As this Court expressly held, "We find that the distinct possibility standard does not apply to § 3730(h)(1)'s second prong and adopt the objective reasonableness standard for protected activity under this prong." *Grant*, 912 F.3d at 201. *See id.* (noting that *Mann v. Heckler & Koch Def., Inc.*, 630 F.3d 338 (4th Cir. 2010), which Defendants cite and rely upon, Resp. Br., p. 40, "was decided before the 2009 amendments").

For the reasons discussed in Simmons's Opening Brief and herein, *infra*, pp. 10-13, Simmons has proffered sufficient evidence such that a reasonable trier of fact could conclude that she engaged in protected activity as her actions were motivated by an objectively reasonable belief that Defendants would soon violate the FCA. Defendants fail to establish that there are undisputed facts showing otherwise.

Apparently recognizing the weakness of its protected activity argument, Defendants argue that even if the Court were to find that Simmons engaged in protected activity, she cannot demonstrate pretext for the same reasons that Defendants claim Simmons cannot demonstrate pretext as to her discrimination

28

claim. Resp. Br., p. 39 n.10, 43-44. Simmons maintains that the evidence demonstrates pretext as to discrimination and, for those same reasons, she has demonstrated pretext as to her FCA retaliation claims. Further, as Simmons's employment was terminated *within two months* of her protected activity, temporal proximity demonstrates pretext as to her FCA retaliation claims. *See Hollis*, 2025 U.S. App. LEXIS 22163, at *30-31.

Lee's angry reaction after Simmons told her that she had contacted NHSN, App. Br., pp. 15, 48, also serves as evidence of pretext. *See*, *e.g.*, *Barber v. Coastal Horizons Ctr., Inc.*, 2024 U.S. Dist. LEXIS 53240, at *36 (E.D.N.C. Feb. 5, 2024) (evidence raising a reasonable inference that plaintiff's termination was in retaliation for her protected activity under the FCA included the fact that the defendant's president and CEO's "'voice was a little angry' after Plaintiff reported Defendant to HUD"); *Fisch v. New Heights Acad. Charter Sch.*, 2012 U.S. Dist. LEXIS 131603, at *17 (S.D.N.Y. Sept. 13, 2012) (evidence permitting "a jury to conclude that his employment was terminated in retaliation for his protected conduct" including the allegation that plaintiff "claims that he was fired mere days after Winnitt became angry with him for informing members of the Finance Committee that expenditures did not match grant budgets").

## CONCLUSION

For these reasons and those set forth in Simmons's Opening Brief, this Court should vacate the District Court's Order and entry of Judgment on Counts I, III and IV, and remand for trial.

Dated: September 17, 2025

Respectfully submitted,

   */s/ Joyce E. Smithey*
Joyce E. Smithey, Esq.
Reuben W. Wolfson, Esq.
Liesel J. Schopler, Esq.
Smithey Law Group LLC
706 Giddings Avenue, Suite 200
Annapolis, Maryland 21401
(410) 919-2990
joyce.smithey@smitheylaw.com
reuben.wolfson@smitheylaw.com
liesel.schopler@smitheylaw.com

*Counsel for Plaintiff-Appellant Kristin Simmons*

30

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,489 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in proportionally-spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: September 17, 2025

*/s/ Joyce E. Smithey*
Joyce E. Smithey

## CERTIFICATE OF SERVICE

I hereby certify that on September 17, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of Court. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: September 17, 2025

                                        */s/ Joyce E. Smithey*
                                        Joyce E. Smithey